In re Carl E. BAYLIS, Debtor.

Constance B. RUTANEN,
et al., Plaintiffs,

v.

Carl E. BAYLIS, Defendant.

Robert D. QUEVILLON, et al., Plaintiffs,

v.

Carl E. BAYLIS, Defendant.

Bankruptcy No. 97–45288–JFQ.
Adversary Nos. 97–4425, 97–4424.

United States Bankruptcy Court,
D. Massachusetts.

June 12, 1998.

Christopher S. Wheeler, Bulkley, Richardson and Gelinas, LLP, Springfield, MA, for Constance B. Rutanen, Ella Quevillon, and Theresa J. Alexander.

Mark W. Powers, Bowditch & Dewey, Worcester, MA, for John Quevillon, Marc Quevillon, Paula L. Flowers, and Robert D. Quevillon

David M. Nickless, Nickless & Phillips, Fitchburg, MA, for Carl E. Baylis.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

In a decision affirmed by the Supreme Judicial Court of Massachusetts,[1] it has been determined that Carl E. Baylis, Esq. (the "Debtor") failed to use reasonable care in attempting to prevent his co-trustee from committing a breach of trust. The question here is whether the ensuing judgments entered against the Debtor are nondischargeable in bankruptcy as debts for "defalcation while acting in a fiduciary capacity" or for "willful and malicious injury by the debtor ... to the property of another" within the meanings, respectively, of sections 523(a)(4) and 523(a)(6) of the Bankruptcy Code.

These two adversary proceedings are brought under sections 523(a)(4) and 523(a)(6) by the income beneficiaries and remaindermen of the Antonia Quevillon Trust, created by instrument dated October 18, 1969 (the "Trust"). Both groups of plaintiffs (the "Plaintiffs") were parties to a proceeding in the Probate and Family Court Department of the Trial Court of Massachusetts (the "Probate Court") which produced the judgments. Now before this court are cross-motions for summary judgment filed in both cases. With the exception of the Probate Court's finding that the Debtor acted in bad faith, the parties agree they are bound under principles of issue preclusion by the facts found by that court.

## I. FACTS

I summarize those findings, adding a few additional and uncontested factual recitals of the Supreme Judicial Court. Antonia Quevillon (the "Settlor") was in her seventies and in poor health at the time she executed the Trust instrument. The Debtor is a practicing attorney who prepared the Trust instrument. The Settlor had for many years owned and managed six apartment buildings in Southbridge, Massachusetts and two apartment buildings in Worcester, Massachusetts. All eight properties were placed into the Trust. Under its terms, income was to be paid in equal shares to the Settlor's five children: Estelle Ballard ("Ballard"), Constance Rutanen, Marcel Quevillon, Robert Quevillon and Theresa Alexander. The Trust was to terminate twenty years from the Settlor's death, at which time the entire corpus was to be distributed in equal shares to the children of Marcel Quevillon, who are

---

1. Rutanen v. Ballard, 424 Mass. 723, 678 N.E.2d 133 (1997).

Robert D. Quevillon, Marc Quevillon, Paula L. Flowers and John Quevillon. The Debtor and Ballard were to become co-trustees upon the death of the Settlor.

The Settlor died on May 10, 1971. Commencing at least at that time, there was "tension" between Ballard and her siblings. Although the value of the trust corpus increased substantially over the years (from $256,000 in 1971 to $1.3 million in 1986), the income distributed to the beneficiaries was meager. From May of 1971 through June of 1985 the Trust was able to pay the income beneficiaries only $48,813, or about $9,762 per beneficiary. Pursuant to an agreement made with the Settlor, Ballard received $50 per week for managing the properties. The Debtor took no active part in property management and received payment only for occasional legal services rendered to the Trust.

The income beneficiaries became restive. They met with the Debtor and Ballard in July of 1985 to express their concerns. Although two of the Trust properties (the two Worcester buildings) had by then been sold, the Trust continued to hold six of the original properties. It was agreed at this meeting, with Ballard voicing no objection, that all the remaining properties would be sold and the proceeds invested in conservative investments such as U.S. treasury notes. The Debtor favored selling the properties. Indeed, prophetically, he believed their value had "peaked."

The properties were placed on the market. By January of 1986 the Trust had received offers for them totaling $1.640 million. A Mr. and Mrs. John Young offered to purchase two of the Southbridge buildings for $215,000. Ramshorn Realty Trust offered $1.425 million for the four remaining buildings. The Debtor obtained the signatures of the buyers on purchase and sales agreements. But Ballard wanted to own the properties herself. After some vacillation, she refused to accede to the Debtor's requests that she sign the purchase and sale agreements.

The Debtor decided to take court action. In preparation for this, in August of 1986 he obtained an appraisal of the properties indicating they had a fair market value of $1.3 million, which was $340,000 less than the total of the prices offered. In December of 1986, the Debtor on behalf of the Trust filed a petition with the Probate Court for a license to sell the properties. When the Debtor informed the court of Ballard's position, the court deferred acting on the petition until she agreed to sell. She never did. The properties were sold for much less after termination of the Trust.

Ramshorn Realty Trust did not resort to legal action. But the Youngs sued the Trust for specific performance and included a fraud count against the Debtor. After having paid the legal expenses to defend the suit, the Trust paid an additional $15,000 to settle the fraud count.

## II. STATE COURT PROCEEDINGS

The income beneficiaries and remaindermen, the Plaintiffs here, later brought suit in Probate Court against Ballard and the Debtor for breach of their fiduciary duties in failing to sell the properties. After a trial, the court ruled that Ballard had violated her duty of loyalty in placing her interests above those of the beneficiaries and had violated her duty of care in not selling unproductive property. It further ruled that the Debtor had breached his duty to use reasonable care to prevent Ballard from failing to fulfill her fiduciary obligations. The court also passed on a clause in the Trust instrument which provided that a trustee "shall be liable only for his own willful misconduct or omissions in bad faith." The court held this exculpatory clause gave the trustees no protection for two reasons: (i) They had both acted in bad faith; and (ii) the clause was unenforceable because the Settlor received no independent legal advice concerning it.

The court found that the Plaintiffs had been damaged in an amount consisting of the difference between the value they would have received had the two sales agreements been consummated and the value they did receive at the termination of the Trust in May of 1991. By amended judgments dated November 4, 1993, the court entered joint and several judgments against the Debtor and Ballard in favor of each group of plaintiffs. The

judgment running to the income beneficiaries was in the sum of $330,079.95, which included damages of $244,493.75 for failure to sell, $27,322.90 for Trust expenditures in the defense and settlement of the Young suit and $58,263.30 in prejudgment interest. The judgment in favor of the remaindermen was in the sum of $607,900.27, composed of $544,-767 in damages and $63,133.27 in prejudgment interest.

Agreeing that the Debtor had violated his duty of care, the Supreme Judicial Court of Massachusetts affirmed. The court ruled that by filing the petition in Probate Court to sell the properties the Debtor had not satisfied his obligation to use reasonable care to prevent Ballard from defaulting in her fiduciary duties.[2] It believed the Debtor should have gone further and told Ballard she was in breach of her duties and, if she continued to refuse to sell, asked the Probate Court to compel her to agree to the sales.[3] The court expressly declined, however, to pass on the Probate Court's finding that the Debtor had acted in bad faith. It regarded the finding as unnecessary to avoid operation of the exculpatory clause. The court invalidated the exculpatory clause because of the Settlor's lack of independent legal advice and poor health.

## III. NEGLIGENT FIDUCIARY CONDUCT AS "DEFALCATION"

A discharge in bankruptcy "does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny...." 11 U.S.C. § 523(a)(4) (1994). The Plaintiffs contend the Debtor is guilty of "defalcation." Although conceding he was a fiduciary, the Debtor denies that his negligence constitutes defalcation within the meaning of the statute.

This exception to a debt's discharge has been with us a long time. Both the Bankruptcy Act of 1867[4] and the Bankruptcy Act of 1898[5] excepted from discharge debts due to "defalcation" by a fiduciary.

The Code has no legislative history giving guidance on whether negligence qualifies as "defalcation." Nor are dictionaries of any help. Black, for example, defines defalcation as follows:

> The act of a defaulter; act of embezzling; failure to meet an obligation; misappropriation of trust funds or money held in a fiduciary capacity; failure to properly account for such funds. Commonly spoken of officers of corporations or public officials.

Black's Law Dictionary 375 (5th ed.1979).

Although "failure to meet an obligation" is broad enough to encompass breach of the duty of care, the juxtaposition of this phrase with acts of intentional malfeasance casts doubt on whether "defalcation" has that reach.

Surprisingly, in view of the long history of this exception to discharge, there is relatively little case law on the question. The decisions that do exist, however, favor the discharge of a debt resulting from failure to use reasonable care while acting as a fiduciary. For the debt to be excepted from discharge as the result of defalcation, courts require the conduct to consist of at least "willful neglect of duty" rather than mere negligence. *E.g., Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 184–85 (5th Cir.1997); *Meyer v. Rigdon*, 36 F.3d 1375, 1384–85 (7th Cir.1994); *Moreno v. Ashworth (In re Moreno)* 892 F.2d 417, 421 (5th Cir.1990); *Jacobs v. Pierce*, 208 B.R. 261, 272 (D.Mass.1997); *Samuels v. Ellenbogen (In re Ellenbogen)*, 218 B.R. 709 (Bankr.S.D.N.Y.1998) (containing extensive citations); *Miramar Resources, Inc. v. Shultz (In re Shultz)*, 208 B.R. 723,

---

**2.** *Rutanen*, 678 N.E.2d at 140.

**3.** *Id.*

**4.** The Bankruptcy Act of 1867 excepted from discharge a debt created by the bankrupt's "defalcation as a public officer, or while acting in any fiduciary character...." Bankruptcy Act of 1867, ch. 176, § 33, 14 Stat. 517 (repealed 1878).

**5.** The Bankruptcy Act of 1898 excepted from discharge debts of the bankrupt "created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity." Bankruptcy Act of 1898, ch. 541, § 17, 30 Stat. 544 (repealed 1978).

730 (Bankr.M.D.Fla.1997). *See also In re Bernard*, 87 F.2d 705, 707 (2d Cir.1937) ("mere negligence" not "misappropriation" under prior Act). The phrase "willful neglect of duty" means conduct that is at least reckless. *Schwager*, 121 F.3d at 185 n. 12.

Some courts imply the same standard by ruling a defalcation to have occurred in the case but observing that the conduct before them amounts to more than negligence or mistake. *E.g., Quaif v. Johnson*, 4 F.3d 950 (11th Cir.1993); *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 257 (6th Cir.1982). Others make the same implication by rejecting the argument that the debtor's conduct was reckless and ruling no defalcation occurred. *E.g., Tucker v. Nestor (In re Nestor)*, 202 B.R. 181, 183–84 (D.Mass. 1996).

■ It is a basic principle of statutory construction that an exception to a debt's discharge should be strictly construed because of the policy favoring a debtor's fresh start. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 59 L.Ed. 717 (1915). This principle has been influential in the decisions holding that negligence is not defalcation under section 523(a)(4). *See, e.g., Meyer*, 36 F.3d at 1384–85.

■ I agree with the decisions requiring more than negligence. Negligence is the result of basic human frailty. It is not conduct of such opprobrium that Congress is likely to have intended the resulting indebtedness to be excluded from a debtor's discharge. There is arguably less fault in negligent conduct than there is in an intentional breach of contract. That the negligent conduct is by a fiduciary seems immaterial. Every person, not just fiduciaries, owes others a duty to exercise reasonable care. Moreover, excluding negligent conduct from the coverage of section 523(a)(4) harmonizes that subsection with section 523(a)(6). *See Part V, infra.*

■ In light of these considerations and the policy favoring a debtor's fresh start, I construe "defalcation" to exclude the conduct present here. The Debtor did not stand by and do nothing. And he did more than merely ask Ballard to agree to the sales. He put pressure on her in two ways, first by presenting her with agreements signed by the buyers and later by filing a petition in court to sell the properties. Although he was adjudicated to have been negligent in not going further and requesting a court order against her, he surely was not in reckless disregard of his obligations concerning Ballard's fiduciary defaults.

There is nothing contradictory in the holding of *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937). That case involved a state court receiver who had obtained an order from the state court authorizing payment of his compensation. Without waiting for expiration of the appeal period, he paid himself the compensation. The order was later appealed and reversed. Upon the receiver's subsequent bankruptcy, the Second Circuit held the payment to be defalcation. Recognizing that the debtor's conduct did not amount to "moral dereliction," 93 F.2d at 511, the court nevertheless believed defalcation covers "other defaults than deliberate malversation." *Id.* But the court went on to say: "We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable.... All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at the time that it may, he is guilty of a 'defalcation' though it may not be a 'fraud' or an 'embezzlement,' or perhaps not ever a 'misappropriation.' " *Id.* at 512. The court thus was clear in stating it had no intention of fixing a standard which excepted from discharge debts resulting from any and all fiduciary defaults. And although the debtor's conduct there was arguably negligent, the court was careful not to opine that all debts resulting from a fiduciary's negligence are nondischargeable.

The Plaintiffs contend that the $27,322.90 component of the judgment relating to the defense and settlement of the Young suit is imposed for more than the Debtor's negligence. That is not so. The Young law suit was the direct result of Ballard's intransigence and the Debtor's failure to solve the problem this created. The Probate Court recognized this causal relationship when it said: "The Trustees' willful and bad faith

**6**

failure to sell also resulted in a law suit by the Youngs which caused further damage to the Trust." Without Ballard's signature on the purchase and sale agreement, the Debtor did not commit the Trust to the sale. The Debtor had little choice but to defend the law suit. There was no reason that he rather than the Trust should pay for the suit's defense and settlement.

The Plaintiffs also rely upon a letter dated July 26, 1986 from Ballard to the Debtor, a copy of which they attach to their memorandum of law. In the letter Ballard agrees to resign as trustee, to accept certain properties as her distributive share and to agree to the sale of the remaining properties. Its last sentence reads: "This letter is to be held in escrow and can only be submitted when and if you are satisfied with respect to the monies due and owing you from the Trust for services rendered." The Plaintiffs say this shows more than negligence because it indicates the Debtor placed his own interests above those of the beneficiaries.

I disagree, for several reasons. In the first place, the facts found by the Probate Court indicate the Debtor filed the petition to sell without Ballard's consent and without first requiring any payment of his fee as co-trustee. And neither the Probate Court nor the Supreme Judicial Court gave this letter as a basis for its ruling. Finally, the findings show that Ballard changed her mind and refused to either resign or sign the purchase and sales agreements.

The Plaintiffs attempt to squeeze the facts of this case into the line of cases holding that a fiduciary's failure to account for missing trust property is defalcation even if the failure is the result of negligence. *See, e.g., Lewis v. Scott (In re Lewis),* 97 F.3d 1182, 1186 (9th Cir.1996); *Hash v. Reed (In re Reed),* 155 B.R. 169, 171–72 (Bankr.S.D.Ohio 1993); *Reliance Ins. Co. v. Wilson (In re Wilson),* 127 B.R. 440, 443 (Bankr.E.D.Mo. 1991); *Ohio Cas. Ins. Co. v. Kern (In re Kern),* 98 B.R. 321, 323–24 (Bankr.S.D.Ohio 1989); *Reliance Ins. Co., v. Gagliano (In re Gagliano),* 44 B.R. 259, 262 (Bankr.N.D.Ill. 1984). But no failure to account occurred here. No trust property is missing. The Debtor was negligent only in his attempts to

prevent his co-trustee's breach of her duties of loyalty and care. Nor would there be a failure to account even if the Debtor had decided to keep the properties and been found negligent in that decision. Moreover, it is far from clear that the cases equating negligent failure to account with defalcation are proper interpretations of the statute. *See Stowe v. Bologna (In re Bologna),* 206 B.R. 628 (Bankr.D.Mass.1997) (reviewing conflicting case law on failure to account and concluding something more than innocent failure must be present).

## IV. ISSUE PRECLUSION ON DEBTOR'S BAD FAITH

■ The Plaintiffs argue the Debtor is collaterally estopped by the Probate Court's finding that he acted in bad faith. It of course is fundamental law that an issue previously litigated between the parties should not be relitigated. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Miles v. Aetna Casualty & Surety Co.,* 412 Mass. 424, 589 N.E.2d 314, 316–17 (1992). This principle of collateral estoppel, or issue preclusion, applies to non-dischargeability proceedings in the bankruptcy court. *Grogan v. Garner,* 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Adjudication of the dischargeability question, however, remains the province of the bankruptcy court. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

■ Where the question arises in a federal court and the prior proceeding took place in state court, the full faith and credit statute is implicated. Judicial proceedings in state court "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such [s]tate...." 28 U.S.C. § 1738 (1994). Massachusetts law of collateral estoppel therefore governs. *Keystone Shipping Co. v. New England Power Co.,* 109 F.3d 46, 50–51 (1st Cir.1997).

■ Massachusetts courts apply traditional principles of collateral estoppel. *Id.* at 51. For a party in the later proceeding to be precluded from litigating a factual issue, four

elements must be present: (1) the issue sought to be precluded must be the same as that involved in the earlier action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding judgment; and (4) the determination of the issue must have been essential to the judgment. *See Martin v. Ring*, 401 Mass. 59, 514 N.E.2d 663, 664 (1987); *Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, 395 Mass. 366, 479 N.E.2d 1386 (1985). *See also Restatement (Second) of Judgments* § 27 (1982); *Keystone Shipping*, 109 F.3d at 51 (1st Cir.1997) (setting forth ·these as the four elements required by both Massachusetts courts and the First Circuit). Massachusetts does not require that the parties to the two actions be identical. *Martin*, 514 N.E.2d at 664.

■ The Probate Court's judgment was based upon its alternative findings of negligence and bad faith. This brings into play a corollary to the requirement that a finding be essential to the judgment for issue preclusion to apply. Where a court's judgment is based upon alternative findings, it is of course true that either finding supports the judgment. But, according to section 27 of the Restatement (Second) of Judgments, both findings lack preclusive effect for two reasons. First, with neither essential to the judgment, the court might not have given either its careful consideration. Restatement (Second) of Judgments § 27 cmt. i (1982). Second, the losing party might be dissuaded from appealing the judgment because of a belief that at least one of the findings might be upheld and the other not even reviewed. *Id. See also Halpern v. Schwartz*, 426 F.2d 102 (2d Cir. 1970). The Restatement's position has been adopted by the Appeals Court of Massachusetts. *See York Ford, Inc. v. Bldg. Inspector and Zoning Adm'r of Saugus*, 38 Mass.App. Ct. 938, 647 N.E.2d 85 (1995). Some of the writers prefer a more flexible rule which denies preclusive effect to such a judgment only when the circumstances indicate a real danger of incomplete litigation, inadequate reasoning or purely speculative appeals. *See* E. William Stockmeyer, *Res Judicata Effect of Unappealed, Independently Sufficient Alternative Determinations*, 70 Cornell L.Rev. 717 (1985); Jo Desha Lucas, *The Direct and Collateral Estoppel Effects of Alternative Holdings*, 50 U.Chi.L.Rev. 701 (1983).

The Plaintiffs point out, however, that the Probate Court's judgment was appealed and affirmed. They therefore rely on an exception to the rule that a judgment based on alternative findings has no preclusive effect. The exception is this. If the judgment is affirmed on appeal, and the appellate court upholds both findings, the judgment is preclusive as to both. Restatement (Second) of Judgments § 27 cmt. o (1982). This is because the appellate court's approval of both findings largely removes the rationale behind the rule. *Id.* The Supreme Judicial Court, the Plaintiffs say, upheld the Probate Court's findings of bad faith and negligence.

The Supreme Judicial Court did not, however, affirm the bad faith finding. It expressly declined to do so because the finding was unnecessary for disposition of the case. Indeed, it regarded the evidence of the Debtor's bad faith to be "questionable." *Rutanen v. Ballard*, 424 Mass. 723, 678 N.E.2d 133, 140 (1997). Despite this clear passage in the opinion, the Plaintiffs rely upon other statements of the court. They observe that in an earlier part of the opinion the court said: "The trustees' lack of good faith which we discuss below suggests that we should be less deferential to the judgment of the trustees." *Id.* at 139. There were two discussion "below," one concerning the "questionable" evidence of the Debtor's bad faith and the other having to do with Ballard. As to Ballard, the court ruled there was ample evidence of her bad faith. *Id.* at 139–40. Later, the court stated that "We have already determined that . . . the decision to retain was made in bad faith." *Id.* at 141. The court is here obviously referring to its previous discussion concerning *Ballard's* decision to retain the properties.

In sum, the Supreme Judicial Court did not affirm the Probate Court's finding of the Debtor's bad faith. To the contrary, it implied that the finding was unsupported by the evidence. I agree.

## V. ABSENCE OF WILLFUL AND MALICIOUS INJURY TO PROPERTY

■ The Plaintiffs also seek a determination that the judgment debts are nondis-

**8**

chargeable as debts for "willful and malicious injury by the debtor ... to the property of another entity...." *See* 11 U.S.C. § 523(a)(6) (1994). This contention may be quickly dispatched in view of the Supreme Court's recent decision in Kawaauhau v. Geiger, —— U.S. ——, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Resolving a split among the circuits, the Court in *Geiger* ruled that an act done intentionally falls outside section 523(a)(6) unless the debtor intended to cause injury. Applying this standard, the Court held that the debt before it, a judgment for negligent medical malpractice, was dischargeable. The same is so as to these judgments. Although the Debtor was negligent, there is nothing in the Probate Court's findings (outside of its bad faith finding) indicating an intention on the Debtor's part to cause injury.

## VI. SUMMARY JUDGMENT

Because of the insufficiency of negligence under the statute and the absence of issue preclusion on bad faith, I deny the Plaintiffs' motions for summary judgment.

I grant the Debtor's motions for summary judgment. A summary judgment motion should be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Bankr.P. 7056. Because negligent conduct is insufficient, the Plaintiffs' case rests on their contention, unaided by issue preclusion, that the Debtor acted in bad faith. I assume for present purposes that bad faith conduct falls within the scope of both sections 523(a)(4) and 523(a)(6).

Bad faith and its antonym, good faith, are amorphous concepts. The most generally recognized definition of good faith is that contained in the Uniform Commercial Code, which requires "honesty in fact." *See* Mass. Ann.Laws ch. 106, § 2–103(1)(b) (Law.Co-op.1984). The subsidiary facts found by the Probate Court do not support the court's conclusion that the Debtor's conduct failed this or any other known test of good faith. They show at most negligence. The court's conclusion of bad faith must therefore be disregarded under the same principle that disregards a master's ultimate conclusion when the conclusion is unsupported by the master's subsidiary findings. *See, e.g., Mahoney v. C. & R. Constr. Co.,* 311 Mass. 558, 42 N.E.2d 255 (1942); *Kasper v. H.P. Hood & Sons,* 291 Mass. 24, 196 N.E. 149 (1935); *Robinson v. Pero,* 272 Mass. 482, 172 N.E. 599 (1930).

Where as here there has been adequate time for discovery, summary judgment is mandated against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]his standard mirrors the standard for a directed verdict...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Having the burden of proof under sections 523(a)(4) and 523(a)(6) on bad faith and other issues, the Plaintiffs have failed to sustain that burden.

Judgments have therefore issued dismissing the complaints in both adversary proceedings.