**Constance B. RUTANEN, Ella Quevillon by and for the Estate of Robert S. Quevillon and Theresa J. Alexander, Appellants,**

v.

**Carl E. BAYLIS, Appellee.**

**No. CIV.A.98–30174–NMG.**

United States District Court, D. Massachusetts.

March 6, 2002.

---

David M. Nickless, Nickless & Phillips, Fitchburg, MA, for Carl E. Baylis.

Mark W. Powers, Gayle Flanders Weiss, Bowditch & Dewey, Worcester, MA, Christopher S. Wheeler, Bulkley, Richardson & Gelinas, Springfield, MA, for appellants.

## MEMORANDUM AND ORDER

GORTON, District Judge.

On October 29, 1999, this Court reversed the Summary Judgment of the United States Bankruptcy Court in favor of Attorney Carl E. Baylis ("Baylis" or "Appellee") and entered Summary Judgment in favor of appellants, Constance B. Rutanen, Ella Quevillon, by and for the Estate of Robert S. Quevillon,[1] and Theresa J. Alexander (together, "the Appellants"). Baylis' debt to Appellants arose from a state court judgment that found that he, as co-Trustee of the Antonia Quevillon Trust ("the Trust"), in bad faith breached certain fiduciary duties to the Appellants. This Court afforded the state court judgment preclusive effect and concluded that the state

---

1. Ella Quevillon is the wife of the late Robert S. Quevillon, who was an income beneficiary of the Antonia Quevillon Trust, and is the executor of her late husband's estate.

court's finding of bad faith rendered Appellee's debts to Appellants nondischargeable under 11 U.S.C. §§ 523(a)(4) and (6).

On Appeal, the Court of Appeals for the First Circuit held that the state court judgment was not entitled to preclusive effect and that entry of summary judgment in favor of Appellants on the grounds of issue preclusion was consequently erroneous. The First Circuit thus vacated the October, 1999 Order of this Court and remanded the case for further proceedings. The issue now at hand is, therefore, whether the Bankruptcy Court was correct in finding that Baylis' actions did not constitute either defalcation or willful and malicious injury within the meaning of the pertinent sections of the Bankruptcy Code, 11 U.S.C. §§ 523(a)(4) and (6).

## I. *Background*

### A. Facts [2]

In 1969, Antonia Quevillon ("the Settlor") transferred six apartment buildings in Southbridge and Worcester, Massachusetts to a Trust she had created. The Trust documents had been drafted by Baylis, an attorney specializing in trusts and estates. He and Estelle Ballard, who was also an income beneficiary ("Ballard"), were appointed as co-Trustees.

As co-Trustees, Ballard was to be paid $50 per week and Baylis was to be paid for specific work he performed for the Trust. Baylis included an exculpatory clause in the Trust agreement providing that the Trustees would be liable only for their own willful conduct or omissions in bad faith. He did not discuss the exculpatory clause with the Settlor or advise her to seek the advice of independent counsel. The Trust agreement also permitted the Trustees to

sell the real estate if the need or occasion arose.

The Trust instrument provided that during its twenty-year life, income was to be paid in equal shares to the income beneficiaries who were the Settlor's five children, Ballard, Constance Rutanen, Marcel Quevillon, Robert Quevillon and Theresa Alexander. At the termination of the Trust, the real estate remaining was to be distributed to the children of Marcel Quevillon. Those children were Robert Q. Quevillon, Marc Quevillon, Paula Flowers and John Quevillon (collectively, "the Remaindermen").

The Settlor died in May of 1971. At that time, Ballard and Baylis sold one of the properties to pay estate taxes. Baylis was paid $17,000 out of Trust funds for acting as co-executor of Antonia Quevillon's estate. Soon after the Settlor died, conflict arose between Ballard and the other income beneficiaries. Although Baylis was aware of the conflict, he did nothing to alleviate it, and in fact, chose to abdicate administration of the Trust to Ballard, leaving to her management of the Trust properties on a day-to-day basis.

Ballard performed her management duties with Appellant Constance Rutanen. Baylis had almost no involvement with the Trust properties and acted as a consultant on an as-needed basis. He maintained no records reflecting work performed in connection with the Trust and was unable to recall how much time he spent performing such work.

From 1971 to 1985, the value of the Trust increased from $250,000 to $1.3 million. During that time, the Trust paid the income beneficiaries a total of $48,813, i.e. $9,762 per beneficiary.

---

**2.** The facts are stated as set forth in the opinion of Probate Judge Lian in *Rutanen, et al. v.*

*Ballard, et al.,* No. 88E0072–G1 (Mass. Prob. Ct. April 15, 1993).

In 1984, the Trustees decided to sell one of the Trust properties located in Worcester. Baylis was paid $1,250 for his services in connection with that sale. The Appellants did not learn of the sale until they received their K–1 tax forms indicating that they would be taxed on the capital gain realized from the sale. They received no proceeds from the sale.

In 1985, the Appellants met with Ballard and Baylis to discuss the administration of the Trust. Baylis informed the Appellants that 1) the Trust "was broke", 2) there would not be enough money to make distributions for the duration of the Trust and 3) each of them was owed $82,000, representing the difference between actual distributions and the amount constructively received and upon which taxes had been paid since 1971. At that meeting, the co-Trustees and the income beneficiaries agreed to sell the remaining properties and invest the proceeds in treasury notes. At that time, Baylis believed that the value of the properties had just about peaked.

In or about January, 1986, the Trust received offers for the properties totaling $1.64 million from two buyers, the Youngs and Ramshorn Realty Trust. Both offerors paid deposits in connection with their offers for separate properties. Ballard decided, however, that she wanted to own the properties herself and expressed her intent to refuse to sell to anyone outside of the family if she could not.

In response to Ballard's refusal to consent to the sale, Baylis sent to her the two offers and gave her an opportunity to match them. When she failed to do so, Baylis tried to persuade her to approve the sale and offered personal inducements. Ballard remained obstinate even though she knew the Appellants wanted to sell the properties.

Despite his awareness of Ballard's refusal to sell, Baylis tendered purchase and sale agreements to the offerors. The Youngs and Ramshorn Realty Trust signed the agreements, eventually obtained financing commitments and remained ready, willing and able to complete their respective purchases.

After obtaining the buyers' signatures on the purchase and sale agreements, Baylis proposed to Ballard that if she agreed to sell the four properties earmarked for Ramshorn, he would arrange for her to be able to retain the other two properties. Ballard agreed and executed a release letter, which Baylis (or someone in his office) had prepared and addressed to Baylis.

The release letter provided that Ballard would approve a plan of distribution to the remaining income beneficiaries and then resign as a Trustee, but it also specified that the letter would not become effective until when and if Baylis was "satisfied" that he had received an appropriate trustee fee for services rendered. In August, 1986, in anticipation of seeking a license to sell from the Probate Court, the Trustees had the properties appraised. The aggregate valuation was $1.3 million or $340,000 less than the sum of the offers received by the Trust.

When the Youngs learned, in December, 1986, of the co-Trustees' agreement not to sell them the property they had agreed to buy, the Youngs sued Baylis for fraud and Ballard and Baylis, as co-Trustees, for specific performance ("the Young lawsuit"). Ballard subsequently withdrew from her agreement with Baylis and the properties remained unsold. In addition, Baylis and Ballard expended Trust funds to defend the Young lawsuit.

That same December, Baylis, on behalf of the Trust, filed a petition in the Probate and Family Court Department of the Trial Court of Massachusetts ("the Probate Court") seeking a license to sell the prop-

erties. The Probate Court deferred its decision pending receipt of Ballard's consent to the sale of the properties. Ballard never consented and, soon thereafter, the real estate market collapsed greatly diminishing the value of the Trust. Baylis made no effort to pursue the Probate Court petition nor to seek a contested hearing even though he knew that Ballard's reasons for refusing to sell were meritless. Baylis also failed to inform Ballard that, as co-Trustee, she had a duty to act in the best interest of all of the beneficiaries.

### B. Prior Proceedings

In 1988, the Appellants along with Marcel Quevillon brought suit in the Probate Court against Ballard and Baylis alleging *inter alia* breach of fiduciary duty, conversion and fraud arising from the facts stated above.[3] After a trial, the Probate Court (Lian, J.) found that Ballard and Baylis breached their fiduciary duties and that Baylis acted in bad faith by knowingly allowing Ballard to breach her fiduciary duties. The court also found the exculpatory clause of the Trust Agreement unenforceable and inapplicable because the co-Trustees acted in bad faith.

The Probate Court awarded judgment in favor of the Appellants in the amount of $224,097.60 for damages arising from the Trustees' breach of fiduciary duties, $27,322.90 for legal fees expended in connection with the Young lawsuit and $58,263.30 in prejudgment interest. The Court also awarded the Remaindermen $544,767 in damages for the Trustees' failure to sell the Trust properties and $63,133.27 in prejudgment interest.

On appeal by the Trustees, the Massachusetts Appeals Court affirmed the judgment of the Probate Court with respect to both its negligence and bad faith determinations. *Rutanen v. Ballard,* 40 Mass. App.Ct. 1113, 664 N.E.2d 1207 (1996).

The Supreme Judicial Court ("SJC") (Fried, J.) granted the Trustees' petition for further appellate review and affirmed the judgment of the Probate Court but expressly declined to reach the issue of bad faith. *Rutanen v. Ballard,* 424 Mass. 723, 678 N.E.2d 133 (1997).

Following the SJC's affirmance, Baylis filed for protection under the bankruptcy laws. The Appellants and the Remaindermen brought separate adversary proceedings opposing the discharge of the judgment debt pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6). Those sections of the Bankruptcy Code prohibit, respectively, the discharge of any debt arising from 1) defalcation while acting as a fiduciary and 2) willful and malicious injury. The parties filed cross-motions for summary judgment, agreeing to be bound by the Probate Court's factual findings except for the finding that Baylis acted in bad faith.

The Appellants and the Remaindermen argued that the Bankruptcy Court should afford the Probate Court's finding of bad faith preclusive effect. The Bankruptcy Court rejected that argument and found neither defalcation nor willful and malicious injury. It held that Baylis' debt was dischargeable and entered summary judgment for the debtor. *Rutanen v. Baylis (In re Baylis),* 222 B.R. 1 (Bankr.D.Mass. 1998).

The Appellants and the Remaindermen appealed to this Court and argued that the Bankruptcy Court had erred in finding that issue preclusion did not apply to the Probate Court's determination of bad

---

**3.** The Remaindermen, i.e., the children of Marcel Quevillon, were intervenor-plaintiffs in that action.

faith.[4] This Court agreed and reversed the decision of the Bankruptcy Court, holding that 1) the Probate Court's finding of bad faith had preclusive effect and 2) a finding of bad faith under Massachusetts law required findings of defalcation and willful and malicious injury under the Bankruptcy Code.

Baylis appealed the decision of this Court to the First Circuit Court of Appeals and it vacated the judgment and remanded for further proceedings. The First Circuit found that because the SJC expressly declined to determine whether Baylis acted in bad faith, the Probate Court's bad faith finding was not entitled to preclusive effect.

## II. *Legal Analysis*

■ Conclusions of law of the Bankruptcy Court are subject to *de novo* review by this Court. *Tucker v. Nestor (In re Nestor)*, 202 B.R. 181, 183 (D.Mass.1996).

### A. Defalcation

■ Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt arising from "defalcation [while] acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). It is undisputed, as Baylis has conceded, that he was acting in a fiduciary capacity at the time the incidents giving rise to the debt occurred.

■ Defalcation is the failure of a fiduciary to produce or account for funds entrusted to him or her. *Nestor*, 202 B.R. at 183; *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 633 (Bankr.D.Mass.1997). The law is unsettled with respect to the degree of fault required to constitute defalcation. Neither the Bankruptcy Code nor its legislative history provides guid-

ance on the level of culpability associated with defalcation. That determination is a significant issue in this case because Baylis' actions are dissimilar from those in traditional defalcation cases where the debtor is unable to account for missing trust funds or property. The judgment debt here arose from the fiduciary's failure to prevent his co-trustee from breaching her fiduciary duties in bad faith.

Most courts that have found defalcation have done so in cases where the debtor improperly fails to account for, absconds with, or commingles funds. *See e.g. Tritter v. Tritter (In re Tritter)*, 1995 WL 648252, 1995 U.S. App. LEXIS 31283 (1st Cir.1995)(trustee commingled funds and used trust funds to pay legal fees); *Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978 (8th Cir.1997)(fiduciary failed to turn over clients' money); *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937)(fiduciary took money upon revocable conditional authority); *Hoff v. Carroll*, 140 B.R. 313 (Bankr.D.Mass.1992)(fiduciary failed to account for missing monies).

Courts have not found defalcation in cases where an investment made by a debtor in a fiduciary capacity proves unsuccessful. *See Samuels v. Ellenbogen (In re Ellenbogen)*, 218 B.R. 709, 711–12 (Bankr.S.D.N.Y.1998). As the Bankruptcy Court has stated in this case, "no failure to account occurred here. No trust property is missing." *Baylis*, 222 B.R. at 6. The basis of Appellants' claim is that Baylis committed defalcation by failing to prevent, or even attempting to prevent, his co-trustee's misconduct and breach of fiduciary duties.

---

4. The two appeals were consolidated and on November 12, 1998, the Remaindermen vol- untarily dismissed their appeal.

Bankruptcy and district courts in Massachusetts have differed with respect to the level of fault required to find defalcation. *See Kwiat v. Doucette,* 81 B.R. 184, 190 (D.Mass.1987)(negligence is sufficient); *Carroll,* 140 B.R. at 316 (mere negligence or ignorance can amount to defalcation); *Sullivan v. Sullivan (In re Sullivan),* 238 B.R. 230, 238 (Bankr.D.Mass.1999)(for a debt to be deemed nondischargeable, a creditor must show that the debtor acted at least recklessly).

The First Circuit Court of Appeals has not directly addressed the issue. In *Tritter,* the First Circuit affirmed a finding by the Bankruptcy Court that a debtor's breach of fiduciary duty constituted defalcation under § 523(a)(4). 1995 WL 648252, at *2, 1995 U.S.App. LEXIS 31283, at *5. The Court did not, however, discuss the debtor's degree of fault.

In *Tritter,* the debtor established an account under the Uniform Gift to Minors Act for his daughter's benefit of which he was custodian. *Id.* at *1, 1995 U.S.App. LEXIS 31283, at *2. While acting as custodian, the debtor failed to keep proper financial records, commingled funds and used account funds to pay his legal fees. The Bankruptcy Court found that because the debtor breached his fiduciary duties as custodian of the account, he committed defalcation and his debt to his daughter was, therefore, nondischargeable. The First Circuit Court of Appeals affirmed the decision finding that the debtor's breach of fiduciary duties constituted defalcation within the meaning of 11 U.S.C. § 523(a)(4) "notwithstanding the absence of any proof of intentional wrongdoing." *Id.* at *2, 1995 U.S.App. LEXIS 31283, at *5.

There is a conflict among the circuits with respect to the degree of fault required by defalcation. The Ninth Circuit Court of Appeals has found that the innocent default of a fiduciary is sufficient to support a finding of defalcation. *Otto v. Niles (In re Niles),* 106 F.3d 1456, 1460 (9th Cir.1997); *Lewis v. Scott (In re Lewis),* 97 F.3d 1182, 1186 (9th Cir.1996). The Eighth Circuit requires a level of fault somewhere between negligence and intentional wrongdoing. *See Cochrane,* 124 F.3d at 984 (defalcation does not require evidence of intentional wrongdoing). The Fifth and Seventh Circuits agree that defalcation requires willful neglect or recklessness. *Schwager v. Fallas (In re Schwager),* 121 F.3d 177, 185 (5th Cir.1997)(applying a recklessness standard); *Meyer v. Rigdon,* 36 F.3d 1375, 1384–85 (7th Cir.1994)(mere negligent breach of a duty is not defalcation under § 523(a)(4)). Finally, the Second Circuit also requires more than negligence and follows the standard enunciated by Judge Learned Hand that the defalcation must be "due to a known breach of the duty, and not to mere negligence or mistake." *Herbst,* 93 F.2d at 512; *Ellenbogen,* 218 B.R. at 711–12.

█ This Court is persuaded to apply the willful neglect or reckless standard adopted by the Fifth and Seventh Circuit Courts of Appeals and by bankruptcy courts in this Circuit. A mere negligence standard conflicts with the language and purpose of the Bankruptcy Code to provide "a fresh start to honest debtors." *Rigdon,* 36 F.3d at 1385; *Sullivan,* 217 B.R. at 677. Construing exceptions to discharge narrowly would be consistent with that principle because it would deny discharge only to blameworthy debtors. *Sullivan,* 217 B.R. at 677.

The language of 11 U.S.C. § 523(a)(4) supports the interpretation that defalcation requires more than mere negligence. Section 523(a)(4) excepts from discharge debts arising from "fraud or defalcation while acting in a fiduciary capacity, embez-

zlement, or larceny." The words "fraud," "embezzlement," and "larceny" connote affirmative misconduct. Under the maxim of *ejusdem generis*, it logically follows that the term "defalcation" also requires an intentional act. *Ellenbogen*, 218 B.R. at 718.

Having determined the standard to apply, it is necessary to decide with what degree of fault Baylis breached his fiduciary duties in this case. The Bankruptcy Court found that Baylis' conduct amounted to negligence and did not, therefore, constitute defalcation under § 523(a)(4). *Rutanen v. Baylis (In re Baylis)*, 222 B.R. 1, 5–6 (Bankr.D.Mass.1998)(Queenan, J.). This Court respectfully disagrees and finds that the debtor's conduct amounted to recklessness.

■ Recklessness is defined as:

the state of mind accompanying an act, which either pays no regard to its probably or possibly injurious consequences, or which, though foreseeing such consequences, persists in spite of such knowledge. To be reckless, the conduct must be such as to evince a disregard of or indifference to consequences although no harm was intended.

*Sullivan*, 238 B.R. at 237 (quoting Black's Law Dictionary 1271 (6th ed.1990)); *see also Greebel, et al. v. FTP Software, Inc., et al.*, 194 F.3d 185, 198 (1st Cir.1999)(reckless conduct is an extreme departure from the standards of ordinary care).

■ This Court is bound to review the Bankruptcy Court's factual findings on a clearly erroneous standard. *Casco Northern Bank, N.A. v. DN Associates, et al. (In re DN Associates)*, 3 F.3d 512, 515 (1st Cir.1993). Reviewing courts apply a clearly erroneous standard because, as the trier of fact, the Bankruptcy Court is "on the front line" and in the best position to judge the credibility of the witnesses and the evidence. *DN Associates*, 3 F.3d at 515; *Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir.1997). In the instant case, however, the Bankruptcy Court did not make independent findings of fact but rather relied on the Probate Court's factual findings noting that "the parties agree that they are bound...by the facts found by that court." *Baylis*, 222 B.R. at 2.

Thus, in the instant case, the Probate Court was in the best position to judge the credibility of the witnesses and evidence. In summarizing the Probate Court's 87 paragraphs of factual findings, the Bankruptcy Court omitted a few significant facts that are relevant to the Debtor's degree of fault. This Court will therefore supplement the Bankruptcy Court's findings of fact with those of the Probate Court.

The Bankruptcy Court found that the litigation involving the aborted sale of property to the Youngs was the result of the debtor's negligence as opposed to willful neglect. *Baylis*, 222 B.R. at 5. To the contrary, this Court finds that the conduct giving rise to that lawsuit constituted recklessness. Knowing of Ballard's refusal to sell the Trust properties, Baylis nonetheless executed purchase and sale agreements for the sale of those properties. The two parties who offered to buy them signed agreements, made deposits, retained financing commitments and remained ready, willing and able to complete their respective purchases. Although the Trust could make no commitment to sell the properties without the written consent of both Trustees, Baylis misled the offerors into believing the sales would go forward and thereby practically assured a lawsuit.

The Bankruptcy Court also failed to incorporate the Probate Court's factual finding that Baylis used Trust funds to pay for

his defense in the Young lawsuit which was filed against him, individually. He also used Trust funds to settle the same buyer's claim against him for fraud. A trustee is not entitled to indemnity by a trust for "expenses not properly incurred by him in the administration of the trust." Restatement (Second) of Trusts § 244 (1959). Baylis' use of Trust funds to defend himself against claims arising from his improper conduct amounted to reckless disregard for his fiduciary duties.

The Bankruptcy Court also found that the Debtor's failure to prevent his co-trustee from refusing to sell the Trust property was mere negligence. His failure even to attempt to compel his co-Trustee to perform her duties, however, constituted a knowing disregard for his fiduciary duties and evinced a disregard for the consequences that were likely to occur from a failure to sell the property.

It is important to note that Baylis is an attorney who specializes in the law of trusts and estates. He was well aware of the duties required of a fiduciary under trust law. Consequently, he knew or should have known that his conduct constituted a breach of his duties as Trustee.

Not long after the meeting at which the Appellants expressed their desire to sell the properties, Baylis estimated that their value had peaked. In or about January of 1986, the Trust received offers totaling $1.64 million. In the summer of 1986, an appraisal of the properties indicated that they had a fair market value of $1.3 million, substantially less than the aggregate price offered. Although Baylis could not have foreseen the collapse of the real estate market, he was aware that 1) the market was very favorable, 2) the Trust would receive tax benefits from selling at that point in time and 3) the Appellants had directed the Trustees to sell the properties.

■ Although the evidence showed that Baylis had a duty (and did, in fact, attempt) to sell the properties, he also had a duty to use reasonable care to prevent Ballard from committing a breach of trust by refusing to authorize such sale. A co-trustee must participate in the administration of the trust and use reasonable care to prevent a co-trustee from breaching her fiduciary duties. Restatement (Second) of Trusts § 184 (1959).

Baylis' conduct constituted a willful disregard for his fiduciary duties. He never informed Ballard that her bad faith refusal to sell the Trust properties was contrary to the best interest of the other income beneficiaries and the Remaindermen and constituted a breach of her fiduciary duties as a trustee. In fact, Baylis attempted to cajole Ballard into selling the properties by extending a lucrative proposal to her whereby she could personally benefit from such sale.

Although Baylis filed a petition in the Probate Court for a license to sell the properties, he neglected:

1) to pursue that petition after the Probate Court decided to defer acting on it until such time as Ballard agreed to sell;

2) to notify the judge of the Probate Court of Ballard's refusal to sell the properties against the wishes of the other income beneficiaries; and

3) to seek a contested hearing with respect to the sale of the properties even though he knew Ballard's non-cooperation constituted a breach of her fiduciary duty.

Baylis' actions constituted more than negligence. It exemplified a reckless disregard for his fiduciary duties as a trustee. The ensuing judgments against him in favor of the Appellants are, therefore, pursuant to 11 U.S.C. § 523(a)(4), nondischarge-

able as debts for defalcation while acting in a fiduciary capacity.

### B.  Willful and Malicious Injury

Because Baylis' debts are nondischargeable due to defalcation, it is unnecessary to determine whether his conduct was willful and malicious. Never the less, that issue is briefly examined.

■ A discharge in bankruptcy does not discharge a debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property, of another entity." 11 U.S.C. § 523(a)(6). The willful and malicious injury exception to discharge applies only to acts committed with the actual intent to cause injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Although the debtor's acts in this case were reckless, the factual findings do not suggest that he committed them with the intent to cause injury to the Appellants. Subsection (6) of the subject section of the Bankruptcy Code is not, therefore, implicated.

### ORDER

For the reasons set forth in the Memorandum above, the Bankruptcy Court's entry of Summary Judgment for the Appellee is REVERSED and the Appellants' motion for Summary Judgment is ALLOWED.

So ordered.