**In re Michael R. SULLIVAN and Kathleen J. Sullivan, Debtors.**

**M–R Sullivan Manufacturing Company, Inc., Plaintiff,**

**v.**

**Michael R. Sullivan and Kathleen J. Sullivan, Defendants.**

**Bankruptcy No. 96–43015–HJB. Adversary No. 96–4366.**

United States Bankruptcy Court, D. Massachusetts.

Sept. 7, 1999.

---

232

Frederick G. Gamble, Temple, AZ, for M-R Sullivan Manufacturing Co., Inc.

Carl Aframe, Aframe & Barnhill, PA, Worcester, MA, for Michael R. Sullivan, Kathleen J. Sullivan.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before this Court for decision is a Complaint Objecting to Discharge (the "Complaint") filed by M–R Sullivan Manufacturing Company, Inc. (the "Company" or the "Plaintiff") against Michael R. Sullivan ("Sullivan") and Kathleen J. Sullivan (collectively, the "Debtors").[1] Whether Sullivan, by his assignment of certain of the Company's patent rights, committed a defalcation under 11 U.S.C. § 523(a)(4), or a "willful and malicious injury" under 11 U.S.C. § 523(a)(6), was the subject of an earlier opinion issued by this Court on the parties' cross motions for summary judgment. *See M–R Sullivan Mfg. Co., Inc. v. Sullivan (In re Sullivan)*, 217 B.R. 670 (Bankr.D.Mass.1998) (hereinafter, *Sullivan I*). This Court then held that Sullivan was its fiduciary within the meaning of § 523(a)(4). *Id.* at 676. However, after determining not to follow its earlier position taken in *Brixius v. Christian (In re Christian)*, 172 B.R. 490 (Bankr.D.Mass. 1994) with respect to the definition of the term "defalcation," the Court ruled both that some level of culpability was required for a finding of defalcation under § 523(a)(4), and that genuine issues of material fact precluded the entry of summary judgment for the Company against the Debtors under either § 523(a)(4) or § 523(a)(6). *Id.* at 678; *id.* at 676. Following trial on the unresolved issues, this Court now returns to these questions.

### I. Facts and Travel of the Case

The Company is an Arizona corporation whose business is the manufacture and marketing of various dental items, including investment castings for dental implants. One of its primary products was a casting ring system called "Clearease," invented by Sullivan. In order to exploit Sullivan's work, he and a certain Roy Brandli ("Brandli") first formed a partnership. After a William Venditti ("Venditti") joined the enterprise in May of 1990, it was incorporated in July of 1990 in the state of Arizona. Sullivan served as President of the Company from its inception until his resignation on November 13, 1992, and remained on the Board of Directors after that date.

Toward the end of 1991, the Company acquired a company called Arizona Wax, which operated a related business. Pursuant to that acquisition, a Gary Moore ("Moore"), one of Arizona Wax's stockholders, received five percent of the Company's stock. During this general time period, a Kenneth Anderson also purchased five percent share of the Company's stock.

Sometime prior to May of 1990, Sullivan commenced an effort to patent the Clearease system, and continued his efforts until a patent was awarded in February of 1993. Most of the expenses for establishing the patent were paid by the Company, and the Company from time to time reported to third parties that it actually owned the patent rights. However, at all relevant times, the patent application remained in the name of Sullivan personally as inventor, and no assignment to the Company was ever executed. Sullivan testified that the omission was intentional, as he never intended to part with ownership of the patent. In his view, the patent would remain as his asset, something to pass on to his children. However, so long as he remained with the Company, Sullivan was content to allow the Company to benefit from its use of the patent rights. Conversely, the other shareholders believed that the patent application and the patent, when awarded, would inure to the benefit of the Company. Venditti conceded that, at all times, he was aware that the patent application was in the name of Sullivan. But Venditti believed the law technically required that the patent applicant be the individual inventor, and that Sullivan serv-

---

1. The parties have now settled all issues between them except for the dischargeability of Sullivan's liability for conversion of the Company's patent rights.

ing as applicant was not inconsistent with true ownership of the patent rights by the Company.[2]

The acquisition of Arizona Wax proved to be a mistake for the Company, and the Company's financial condition began to badly deteriorate thereafter. In October of 1992, Venditti, Moore and Brandli concluded that the Company had to suspend all officer salaries payments and lay off all non-officer employees. The officers would, in their view, have to perform all company functions, including manufacturing and shipping. Sullivan vehemently disagreed. His personal financial circumstances could not tolerate the suspension of salaries. When his request that the Company pay him a royalty for the Clearease system in lieu of salary was denied, he resigned as President of the Company, but remained as a director. He sought work elsewhere, ultimately finding a position in January of 1993 with one of the Company's vendors, Leach & Dillon Company.

In February of 1993, the Clearease patent was awarded to Sullivan. In the following month, at the request of his new employer, Sullivan executed an agreement assigning the patent to Leach & Dillon Company.[3] Armed now with the exclusive right to manufacture dental implants using the Clearease system, Leach & Dillon Company demanded royalty payments from the Company. Subsequently, Venditti, Moore and Anderson filed on behalf of the Company a shareholders' derivative suit against the Debtors in the Superior Court of Arizona, alleging, inter alia, the Debtors' conversion of corporate assets, including the Clearease patent.[4] On August 10, 1995, an Arizona jury returned a verdict in favor of the Company against the Debtors, awarding damages in the amount of $500,000.00 for conversion of the Clearease patent, and another $18,-500.00 for conversion of corporate funds (the "Arizona Judgment").[5]

On June 5, 1996, the Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code; and the Company subsequently filed the instant Complaint, seeking to have the debt arising from the Arizona Judgment declared non-dischargeable under §§ 523(a)(4) and (a)(6). Cross motions for summary judgment were filed, a hearing was held, and the matter was taken under advisement. This Court issued an opinion ("*Sullivan I* ") in which it held that Sullivan was a fiduciary of the Company at the time of the alleged conversion of the patent rights;[6] but that, in light of the lack of any requirement under Arizona law that conversion necessarily include elements of intention or culpability, Sullivan was not collaterally estopped from arguing that a defalcation or a willful and malicious injury to the Company had not occurred.[7] A trial was subsequently held

---

2. The other shareholders suggest that they were deceived by Sullivan into believing that the Company owned the patent. But notably, the Arizona jury verdict described below found for the Debtors in respect of claims by Moore, Brandli and Anderson alleging fraud by Sullivan and in respect of their request for the imposition of punitive damages.

3. Sullivan believed that he was merely licensing the patent rights to Leach & Dillon Company, but later came to understand that what he had executed was a complete assignment.

4. Separate litigation with Leach & Dillon Company was settled by, inter alia, a direct assignment of the patent to Leach & Dillon Company by the Company.

5. The dispute over dischargeability of the latter amount-related to Sullivan's personal expenses paid by the Company-was resolved by agreement prior to trial.

6. In *Sullivan I*, the Court found the basis of the fiduciary relationship in Sullivan's position as President of the Company. On further review, Sullivan may not have been the Company's President during the relative time period, but was undoubtedly a director. Because a director also bears fiduciary duties to a corporation under Arizona law, see *Sullivan I* at 675, the Court's error, if any, appears not to require a change in the analysis.

7. The Arizona Judgment conclusively determined that Sullivan had unjustifiably interfered with the right of the Plaintiff to use the

on the remaining issues; and the Court again took the matter under advisement.

## II. *Positions of the Parties*

The Company argues that recklessness is the proper standard of culpability for finding a defalcation within the meaning of § 523(a)(4), and that Sullivan's conduct with regard to the transfer of patent rights to Leach & Dillon Company constituted a reckless disregard for his duties as a fiduciary of the Company. Further, the Company maintains that Sullivan intended to cause injury to the Company when he transferred the patent, or that injury was a virtual certainty, and therefore, the Company's claim ought to be nondischargeable under § 523(a)(6).

In contrast, Sullivan argues that his actions were taken in a good faith belief that he held the right to transfer the patent, and that because of the severe financial crisis facing the Company, it was unable to make use of the patent in manufacturing. Because he claims to have acted at all times in good faith, Sullivan alleges that he did not commit a defalcation or inflict a willful and malicious injury on the Company.

Clearease system. Thus, Sullivan may not now claim that he had the right to transfer the patent rights to Leach & Dillon Company. At issue in the case at bar is what level of culpability attached to his actions, and what level of culpability is required to show defalcation under § 523(a)(4); not whether Sullivan was acting rightfully in effecting the transfer.

8. The issue has come before several of the bankruptcy judges of the districts which comprise the First Circuit, with divergent results. Judges Queenan and Kenner both agree that a finding of mere negligence is insufficient. *See Rutanen v. Baylis (In re Baylis)*, 222 B.R. 1, 4–5 (Bankr.D.Mass.1998) (Queenan, J.) (recklessness is the appropriate standard); *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 635 (Bankr.D.Mass.1997) (Kenner, C.J.) (more than mere negligence is required). In contrast, Judges Vaughn, Lamoutte and Votolato have ruled that the mere failure by a fiduciary

## III. *Discussion*

In general, exceptions to a debtor's discharge must be strictly construed to promote the policy favoring the debtor's fresh start. *See Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915), *cited in Rutanen v. Baylis (In re Baylis)*, 222 B.R. 1, 5 (Bankr.D.Mass. 1998). Section 523(a)(4) lays out a two-part test for a finding of nondischargeability. First, the debtor must have stood in a fiduciary relationship with the plaintiff. Second, the debtor must have been guilty of one or more acts of fraud, embezzlement or defalcation while acting in that capacity.

### A. *The Proper Standard for Culpability under § 523(a)(4)*

Neither the Supreme Court nor the Court of Appeals for the First Circuit has yet addressed the issue of what level of culpability is appropriate for a finding of defalcation under § 523(a)(4).[8] Other circuits have examined this question, and the results have varied widely. The Ninth Circuit, for example, has determined that no showing of fault by the creditor is required.[9] *See Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1462 (9th Cir.1997); *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186

to account for funds is enough to constitute defalcation and therefore justify nondischargeability of the debt. *See Peerless Ins. v. Swanson (In re Swanson)*, 231 B.R. 145, 148–49 (Bankr.D.N.H.1999) (Vaughn, J.); *Lynch v. Brunero (In re Brunero)*, 223 B.R. 263, 265 (Bankr.D.R.I.1998) (Votolato, J.); *Commissioner of Ins. of P.R. v. Del Valle Otero (In re Del Valle Otero)*, 174 B.R. 873, 881 (Bankr. D.P.R.1994) (Lamoutte, C.J.). *See also Jacobs v. Pierce*, 208 B.R. 261 (D.Mass.1997); *Tucker v. Nestor (In re Nestor)*, 202 B.R. 181 (D.Mass. 1996).

9. The Ninth Circuit held that state common law applied to determine whether a defalcation had occurred; and that under California law, the burden shifted to the debtor/defendant to account for funds held in trust for the plaintiff/creditor. *See Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1462 (9th Cir.1997). The Ninth is the only circuit to employ such a burden shifting analysis.

(9th Cir.1996); *but see Federal Deposit Ins. Corp. v. Jackson*, 133 F.3d 694, 703 (9th Cir.1998) (court ruled that debtor's actions would be protected by business judgment rule, so negligence or gross negligence was the proper standard for underlying liability; however, once proven, defalcation would lie even if actions were innocent). The Eighth Circuit agrees.[10] *See Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir.1997).

■ In contrast, the Fifth and Seventh Circuits have both held that a showing of fault is required.[11] The Fifth Circuit has stated that a defalcation is a "willful neglect of duty, even if not accompanied by fraud or embezzlement." *LSP Inv. Partnership v. Bennett (In the Matter of Bennett)*, 989 F.2d 779, 790 (5th Cir.1993). It later clarified confusion created by its earlier use of the "willful neglect" standard by conforming the standard to one of recklessness. "While defalcation may not require actual intent, it does require some level of mental culpability. It is clear in the Fifth Circuit that a 'willful neglect' of fiduciary duty constitutes a defalcation— essentially a recklessness standard." *In the Matter of Schwager*, 121 F.3d 177, 185 n. 12 (5th Cir.1997). In another context, the Fifth Circuit has defined "willful neglect" as a "conscious, intentional failure or

reckless indifference." *Id.* (defining "willful neglect" in the context of a statute penalizing late estate tax return filings). The Seventh Circuit has followed the Fifth, holding that "a mere negligent breach of duty is not a 'defalcation' under § 523(a)(11)." [12] *Meyer v. Rigdon*, 36 F.3d 1375, 1382 (7th Cir.1994).

In general, courts have taken at least two approaches to defining the parameters of the term defalcation under § 523(a)(4). The Ninth and Eighth Circuits exemplify one, where innocent breaches of fiduciary duty are sufficient to block the debtor's discharge. The opposing view, seen in the Fifth and Seventh Circuits, is that at least recklessness is required to defeat the discharge.

■ Among those courts which have assigned a level of culpability, all have agreed that the proper level of responsibility is recklessness. Conduct by fiduciary debtors which is merely negligent is insufficient to prove defalcation under § 523(a)(4). To hold a debtor to a standard requiring perfectly prudent behavior would be to ignore the realities that likely landed the debtor in bankruptcy at the outset. "Requiring a certain degree of fault by the debtor is more consistent with Congress' intent to narrowly construe exceptions to discharge." *Sullivan I* at 677–

10. However, the Eighth Circuit makes no mention of shifting the burden to the debtor to show that a defalcation did not occur. *See Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir.1997).

11. The Sixth Circuit has also held that " 'mere negligence or mistake of fact' is insufficient to constitute a 'defalcation.' " *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 257 (6th Cir.1982) (holding that debtor is charged with knowledge of the law and imposing an objective standard under which mere negligence or mistake of fact alone would be insufficient to show defalcation). However, in a later decision, the Sixth Circuit has suggested that "[d]efalcation ... occurs through the misappropriation or failure to properly account for ... trust funds." *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 180 (6th Cir.1997). Although this

language would seem to imply that fault was not required, no mention was made of the issue, and the decision turned on whether the debtor was a fiduciary.

12. Section 523(a)(11) provides that "in any final judgment ... consent order ... [or] settlement agreement ... arising from any act of fraud or defalcation while acting in a fiduciary capacity committed with respect to any depository institution or credit union" shall be non-dischargeable. The standard for defalcation under (a)(11) is the same for that under (a)(4); the former provision broadens the types of final dispositions on which the non-dischargeability finding may be based in connection with the nation's banking system. *See Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir.1994) (explaining why Congress enacted (a)(11), which appears to repeat the standard in the already enacted, broader § 523(a)(4)).

78, *citing Gleason v. Thaw,* 236 U.S. at 562, 35 S.Ct. 287. "Negligence is the result of basic human frailty. It is not conduct of such opprobrium that Congress is likely to have extended the resulting indebtedness to be excluded from a debtor's discharge." *Rutanen v. Baylis (In re Baylis),* 222 B.R. at 5. Negligent conduct, even by the fiduciary, while not precisely innocent, simply does not exclude the honest but unfortunate debtor from entitlement to the fresh start promised by the Bankruptcy Code.

 On the other hand, requiring that a creditor prove that the debtor had the intent to harm renders the use of the term "defalcation" redundant. "Whatever was the original meaning of 'defalcation,' it must here have covered other defaults than deliberate malversations, else it added nothing to the words, 'fraud or embezzlement.'" *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 511 (2d Cir.1937) (examining the predecessor to § 523(a)(4), § 17(a)(4) of the Bankruptcy Act, or 11 U.S.C. § 35(4)). The familiar rule of statutory construction dictates that courts should "avoid a construction of a statute that renders any provision superfluous. When possible, every word Congress used should be given effect, 'so that no part will be inoperative or superfluous, void or insignificant.'" *Commonwealth of Pa. Dept. of Public Welfare v. United States Dept. of Health and Human Serv.,* 928 F.2d 1378, 1385 (3rd Cir.1991) (internal citations omitted), *citing* 2A Sutherland Statutory Construction § 46.06 at 104. Both larceny and embezzlement ne-

cessitate showing specific intent on the part of the debtor, and to demand the same showing for defalcation would be to call on the creditor to prove precisely the same elements for embezzlement as for defalcation, rendering superfluous the addition of the word defalcation to the statute.[13] *See State of Ariz. v. Scofield,* 7 Ariz.App. 307, 438 P.2d 776, 780 (1968); Ariz.Rev.Stat. Ann. § 13–1802(A)(2) (West 1998).

 Between these two alternatives lies the third option, a standard of recklessness. Recklessness is defined as "[t]he state of mind accompanying an act, which either pays no regard to its probably or possibly injurious consequences, or which, though foreseeing such consequences, persists in spite of such knowledge. ... [T]o be reckless, the conduct must be such as to evince disregard of or indifference to consequences ... although no harm was intended." Black's Law Dictionary 1271 (6th ed.1990). Such a standard preserves the protection for the "honest but unfortunate debtor" on the one hand; and retains the statutory integrity of § 523(a)(4) by distinguishing defalcation from the higher standards of larceny and embezzlement on the other. This standard also recognizes that some element of knowing omission or malfeasance was involved in the debtor's conduct. This Court therefore joins those which have held that for a debt to be deemed nondischargeable under § 523(a)(4) on account of the debtor's defalcation while acting in a fiduciary capaci-

---

**13.** Larceny in Arizona is a common law crime. *See State of Ariz. v. Scofield,* 7 Ariz. App. 307, 438 P.2d 776, 780 (1968). Embezzlement is statutory, and at its heart is a breach of trust. *See id.* Arizona has defined six classes of theft within one statute; one of which corresponds with a general understanding of embezzlement. *See id.* (relying on C.J.S. and Am.Jur. in defining the elements of embezzlement). "A person commits theft if, without lawful authority, the person knowingly ... converts for an unauthorized term or use services or property of another entrusted to the defendant or placed in the defendant's possession for a limited, authorized term or use...." Ariz.Rev.Stat. Ann. § 13–1802(A)(2) (West 1998). Embezzlement was designed to penalize criminal conversions in which no trespassory taking occurred. *See State of Ariz. v. Superior Court of Pima County,* 27 Ariz.App. 430, 555 P.2d 898, 899 (1976). Larceny, then, differs as to when the required intent must be formed, and what relationship the defendant must have to the victim and the property. The intent required is the same— knowingly depriving another of property or services.

ty, the creditor must show that the debtor acted at least recklessly.

In this case, having heard and reviewed the testimony and all of the documentary evidence, this Court is persuaded that Sullivan was not "indifferent" to the consequences for the Company arising from his transfer of the Clearease patent. He was simply not aware that his actions were improper. He held a good faith, albeit erroneous, belief that his legal ownership of the patent permitted his actions. That belief had an objective basis. After all, he took with him an asset which was technically in his name alone. True, an Arizona jury ultimately found that equitable rights of the Company were superior to his legal right to the Clearease patent. But only a showing of Sullivan's recklessness is sufficient to meet the Company's burden of proof under § 523(a)(4). Acting under the information he had at the time, Sullivan's actions were not in willful disregard of a duty he had to the Company. Sullivan was not reckless. He was simply wrong. The latter alone may have been sufficient for the Arizona jury to find conversion. But it is not alone sufficient to support a finding of defalcation under § 523(a)(4). Seen both subjectively and objectively, his was not "conduct of such opprobrium" that Congress would likely have included it as part of the discharge exception. See *Baylis*, 222 B.R. at 5.

B. *Willful and Malicious Injury*

Section 523(a)(6) excepts from the debtor's discharge any debt arising out of a "willful and malicious injury by the debtor to another entity or the property of another entity." 11 U.S.C. § 523(a)(6). Unlike § 523(a)(4), this section has been the recent subject of a definitive Supreme Court ruling.[14] *Kawaauhau v. Geiger*, 523

U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). In *Geiger*, the Supreme Court held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional injury, not merely a deliberate and intentional act that leads to injury." *Id.*

The First Circuit further clarified the word "willful" to mean that the debtor/defendant must have specifically targeted the creditor with the act committed—in other words, the debtor must have intended the specific injury to the specific victim.[15] See *Roumeliotis v. Popa (In re Popa)*, 140 F.3d 317, 318 (1st Cir.1998); see also *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 20 (Bankr.D.Me.1998) (wrongful act must be targeted at the creditor). "Intentional" injuries are those which the actor deliberately causes, or which are "substantially certain to cause injury." *Id.* at 18, citing Restatement (Second) of Torts § 8A (1964), cited in *Geiger*, 523 U.S. at 58, 118 S.Ct. 974.

Left unaddressed by the Supreme Court and the First Circuit is the meaning now to be attributed to the term "malicious" in the statute. Prior constructions had attributed the 'targeting' test to the malicious prong of § 523(a)(6), or held that showing intent to injure was sufficient. See *McAlister*, 225 B.R. at 20. In *Geiger*, the Supreme Court appeared to subsume that test into the finding of a "willful" injury. *Id.* Yet, to avoid redundancy, the addition of the word "malicious" must have its own meaning. In *McAlister*, Judge Haines proposed that to meet the second prong of the § 523(a)(6) test for non-dischargeability, a creditor must show that the willful injury was undertaken without just cause or excuse. *Id.* at 21. Such a construction is thematically consistent with

14. For a detailed discussion of the pre-Geiger status of the case law under this section in the First Circuit, see *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 16–17 (Bankr.D.Me. 1998).

15. Of course, it is seldom, if ever, that a court sees direct evidence of a debtor's affirmative proclamation of intent to injure the creditor. This showing, if it is to be made at all, must necessarily be made through circumstantial evidence.

the Supreme Court's and the First Circuit's construction, by limiting nondischargeability to cases where the debtor's actions are objectively wrongful.

 This Court has already found that Sullivan maintained a good faith belief that he owned the patent and was free to act with respect thereto without restriction. He did not intend to wrongfully harm the Company. He believed that he was acting within his legal rights. His actions cannot properly be construed as a willful and malicious injury to the Company within the meaning of § 523(a)(6).

### IV. Conclusion

For the foregoing reasons, the Court rules in favor of debtor-defendant Michael R. Sullivan under both § 523(a)(4) and § 523(a)(6); the debt of Sullivan to the Company arising from the Arizona Judgment is therefore discharged.