Constance Rutanen & others[1] vs. Estelle Ballard & another,[2] trustees.[3]

Worcester. February 4, 1997. - April 15, 1997.

Present: Wilkins, C.J., Lynch, O'Connor, Fried, & Marshall, JJ.

*Practice, Civil,* Findings by judge. *Trust,* Assets of trust, Beneficiary, Negligence of trustee, Investments, Trustee's authority, Trustee's compensation. *Fiduciary. Damages,* Breach of fiduciary duty.

In an action alleging trustees' breach of fiduciary duty, the defendants did not demonstrate that the judge's findings were not a product of the judge's independent judgment. [726-727]

Evidence that a trust's sole property was worth $250,000 in 1971 and had increased in value to $1.3 million by 1985, and that over that period the trustees had distributed to income beneficiaries only slightly more than $3,000 per year, justified the judge's conclusion that the property was underproductive and that the trustees were under a duty to sell the property, in circumstances in which the trust instrument authorized such sale and there was no evidence that the trust settlor manifested any intent that the assets be retained. [727-730]

The judge in an action for trustees' breach of fiduciary duty correctly concluded that one trustee acted out of self-interest and in bad faith in refusing to sell underproductive trust assets [730-731]; and that the other trustee acted at least negligently [731-732].

An exculpatory clause in a trust instrument drawn by a trustee who was the settlor's attorney, stating that each trustee should be liable "only for his own wilful misconduct or omissions in bad faith" and inserted without the aged and infirm settlor's receiving independent advice as to the clause's existence, meaning and effect, was ineffective to protect the trustee, and the trustee could properly be held liable for ordinary breach of fiduciary duty. [732-733]

Trustees who were liable for a bad faith retention of unproductive trust assets were properly held accountable also for the unforeseeable decline in the property's value. [734]

At the trial of an action for trustees' breach of fiduciary duty, the judge's finding that a proposed buyer of the trust property, whose offer was rejected by the trustees in bad faith, was ready, willing and able to consummate the purchase was not clearly erroneous. [734-735]

[1]Marcel Quevillon, Robert S. Quevillon, and Theresa Alexander; Robert D. Quevillon, Marc Quevillon, John Quevillon, and Paula L. Flowers as interveners.

[2]Carl Baylis.

[3]Of the Antonia Quevillon Trust and individually.

In an action alleging trustees' breach of fiduciary duty, one trustee's
improper attempt to sell the trust property warranted the judge's assess-
ment of damages against the trustees for their payment out of trust as-
sets the costs of settling the claims of the prospective buyers upon the
failure of the sale. [735]

A trustee who agreed with the settlor of the trust to manage the trust prop-
erty for a sum certain, and who received that sum, was entitled to no
more [735]; the other trustee, who did not demonstrate that he performed
any services for the trust, was not entitled to any compensation [735-736];
and finally, the trustees waived any claim to compensation where they
evinced no intention, during the fourteen years that they paid income to
the beneficiaries, to make such a claim [736].

CIVIL ACTION commenced in the Worcester Division of
the Probate and Family Court Department on May 23, 1988.

The case was heard by *Joseph Lian, Jr., J.*

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*George C. Deptula* for Carl E. Baylis.

*Joseph Hamilton* for Estelle C. Ballard.

*Barry A. Bachrach* for the interveners.

*Robert A. Gelinas* (*Christopher Wheeler* with him) for Con-
stance Rutanen & others.

FRIED, J. The income beneficiaries of the Antonia Quevil-
lon Trust commenced this action in the Probate and Family
Court against the trustees of that trust for breach of their fi-
duciary duties to the trust in that they did not sell unproduc-
tive property of the trust. The remaindermen of the trust
intervened on the side of the income beneficiaries. The judge
made findings that the trustees violated their fiduciary duty
and awarded damages. The trustees appealed arguing that
their actions were protected by an exculpatory clause in the
trust instrument, that the judge's findings of breach of trust
were in error, and that the damages awarded were specula-
tive. The Appeals Court affirmed, see 40 Mass. App. Ct. 1113
(1996), and we granted the defendants' application for further
appellate review. We also affirm the judgment of the Probate
Court.

I

In 1969, Antonia Quevillon, the settlor of the trust,
consulted attorney Carl Baylis regarding the disposition of

the apartment buildings she owned and operated. At that time, she was seventy years old and in poor health. She had had no prior relationship with Baylis. Baylis drafted a trust into which she transferred her property. After the death of the settlor, the trust was to provide income to her children for a period of twenty years at which point it would terminate, and the trust property was to be divided equally among the children of Marcel Quevillon, a son of the settlor.

Baylis and Estelle Ballard, daughter of the settlor and one of the income beneficiaries, were appointed cotrustees. Ballard agreed to manage the property for $50 per week. Baylis did not discuss any management fees with the settlor. The trustees had discretion to sell the trust property. The trust also contained an exculpatory clause which stated that "[e]ach trustee shall be liable only for his own willful misconduct or omissions in bad faith."

After the settlor's death in 1971, the trust property was managed almost exclusively by Ballard until 1986, with Baylis taking little interest. The property appreciated substantially in value from $256,000 in 1971 to $1.3 million in 1986, but paid the income beneficiaries only $48,813 during that period.[4] In 1985, the income beneficiaries met with the cotrustees to discuss the lack of income from the trust property. At that meeting, Baylis urged that the property be sold and invested in government bonds. The income beneficiaries agreed to this proposal,[5] and the trustees began accepting offers. They received one offer of $215,000 for two of the properties and another offer, subject to the availability of financing, of $1.425 million for the other four properties. The six properties were appraised for a total of only $1.3 million.

Ballard, however, desired to own the properties herself. Baylis, knowing this, presented the offers to her and gave her an opportunity to match them, but she could not finance the purchase. She then refused to sell the property and later testified that she had not given consideration to either the income beneficiaries or the remaindermen in making that decision.

Even though Ballard refused to sell the property, Baylis forwarded purchase and sale agreements to the prospective

---

[4]The trust did pay taxes and other expenses from the estate out of income derived from the trust profits which reduced the sums available for distribution.

[5]The remaindermen were also in favor of the sale.

buyers. The buyers signed the agreements and put down deposits toward the purchase price. Ballard continued to refuse to sell the property. Baylis responded by proposing that Ballard would receive the two properties for which $215,000 had been offered, and would allow the other sale to proceed. Ballard agreed to this proposal, but the prospective buyer of the properties which were then going to be sold to Ballard sued the trustees, both individually and in their capacity as trustees. The trust settled the case with the buyer and paid expenses associated with the suit. Baylis prepared and filed a petition in Probate and Family Court for a license to sell the property and terminate the trust in December, 1986, but Ballard withdrew her support of the sales.

The income beneficiaries filed suit against the trustees. The trust eventually terminated, and the property was transferred to the remaindermen. At that time, the estimated value of the property was approximately $1.081 million.

The judge found that the trustees had violated their fiduciary duties, that both had acted in bad faith, that the exculpatory clause was ineffective, that the trust should not have paid all the expenses from the earlier suit over the property, and that the trustees were entitled to no fees from managing the trust. The judge awarded damages based on what the net proceeds of the sale would have been had the offers described above been accepted.[6] He awarded the income beneficiaries pro rata shares of the interest that the trust would have received had the proceeds been invested in six-month United States Treasury bills, and awarded the remaindermen pro rata shares of the difference between the proceeds of the sale and the value of the property when it was transferred.

## II

### A

The trustees initially claim that in reviewing the judge's findings, we should apply stricter scrutiny because the judge adopted many of the plaintiffs' proposed findings of fact verbatim. They further contend that the fourteen months be-

---

[6]The offered price was $1.64 million. The judge subtracted the applicable State and Federal taxes, the repayment of a small mortgage, and assumed legal fees of 1% of the purchase price. He concluded based on these calculations that the property would have yielded net proceeds of $1,238,044.

tween the trial and the date when the findings were issued is further evidence that the findings were not a product of the judge's independent judgment. Rule 52 (a) of the Massachusetts Rules of Civil Procedure, as amended, 423 Mass. 1402 (1996), states the general rule: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses." Where findings of fact lack a " 'badge of personal analysis' " by the trial judge, however, we "shall be more likely in a close case to disregard a finding." *Cormier* v. *Carty*, 381 Mass. 234, 237 (1980). In that case the judge adopted verbatim proposed findings apparently submitted after he had already made a decision as to the outcome. *Id*. at 236-237. The court carefully avoided criticizing the practice of soliciting proposed findings from the parties: "[w]e in no way suggest that courts may not receive [or solicit] conventional requests for findings and adopt those submitted by one party and reject those of the other." *Id*. at 237. We reject the contention that the findings here require "stricter scrutiny." The time interval and the fact that some of the findings are taken verbatim from counsel's proposed findings are insufficient to override the presumption that the judge made an independent judgment as to the facts. Cf. *Louis Dreyfus & Cie.* v. *Panama Canal Co.*, 298 F.2d 733, 737-738 (5th Cir. 1962) ("[n]umerous cases have approved the practice of adoption by the trial judge of findings submitted by counsel for the prevailing party and have held that such findings are entitled to the same weight as they would receive if drafted by the judge himself," citing cases from five other Federal Circuit Courts of Appeals). The judge made eighty-seven findings of fact, and twenty-three were written by the judge himself. In addition, the judge took an active role in the proceedings, questioning several witnesses himself. The fourteen-month interval between the end of the trial and the issuance of the judge's findings is inconclusive evidence of a lack of independent judgment.

B

The trustees contend that they did not as both a factual and legal matter violate their fiduciary duty and that the judge's findings of bad faith are in error. The trustees further contend that the trust specifically authorized the retention of

the properties and that therefore the decision not to sell the properties was within the trustees' discretion and that, even if in some circumstances they might be under a duty to sell, the properties were not so unproductive as to require such a sale. In a case such as this where a trust is to provide income to beneficiaries for a term of years and then the trust property is to be distributed to remaindermen, the trustees are under a duty to sell the trust property when it becomes unproductive "in the absence of manifestation of intent on the part of the testator or settlor that the property be retained even if it becomes unproductive." *Springfield Safe Deposit & Trust Co.* v. *Wade,* 305 Mass. 36, 39 (1940). Trustees are also required to sell "under-productive property" as well — "property [that] produces an income which is substantially less than the income which would be derived if the property were sold and the proceeds were invested so as to yield the current rate of return on trust investments." Restatement (Second) of Trusts § 240 comment b, at 594 (1959); 3A Scott, Trusts § 240 (4th ed. 1988). Strict application of a rule that would require a sale whenever the income produced is lower than the current going rate, however, would interfere with the trustee's discretion granted by the settlor and might upset the settlor's preference that the property be retained at least insofar as the rate of return on the investment is not widely disparate from the return that could be had elsewhere. Cf. *North Adams Nat'l Bank* v. *Curtiss,* 278 Mass. 471, 481 (1932) (trustee may consider that assets were initially purchased by settlor in deciding whether they should be sold). Thus where "the income derived is somewhat less" than the going rate, the trustee is under no obligation to sell. The duty to sell is triggered "only where the difference is so great that it is unfair to the life beneficiary to retain the property." Restatement (Second) of Trusts § 240 comment b. The rule further allows the trustee to exercise discretionary powers in that the trustee is entitled to weigh prudential concerns such as the makeup of the portfolio of investments as a whole, the likelihood of growth in value of the assets, and tax consequences. 3A Scott, *supra* at § 240. In this case, the rate of return is highly disproportionate to what could be earned elsewhere. By 1985, fourteen years into the life of the trust, the trustees had distributed only $48,813 to the income beneficiaries. The trust property was worth over $250,000 in 1971 and had increased

in value to $1.3 million. By any measure, income of only slightly more than $3,000 per year is far below what would be expected on a trust corpus of this size.[7] Furthermore, Baylis testified that at the time of the proposed sale, the trust was nearly devoid of any cash assets. Prudential concerns do not justify retention. The properties were the only trust asset so the real estate could not be justified either as necessary for a balanced portfolio nor can the trustees argue that other assets were producing substantial income for the beneficiaries. As for the growth in the value of the asset, the track record of the investment lends some support for the idea that the asset was retained because it was growing in value from $256,000 in 1971 to $1.3 million in 1986. Over the course of those fifteen years, the remaindermen derived almost all the benefits of the retention and continued retention of the assets, even if they continued to increase in value, would exacerbate that disparity. Second, there was evidence that the trustees, at least Baylis, were aware that property values had "peaked" and were not likely to continue rising as they had before.[8] The offers made for the property totalled substantially more than the amount for which the properties were appraised at the time so that the trustees would have needed a reasonable expectation that the properties would have appreciated to a value more than the offer price to justify retention on this ground. Favorable tax consequences were also available if the trust had been sold at that time. The trustees' lack of good faith which we discuss below suggests that we should be less deferential to the judgment of the trustees. These facts justify the judge's conclusion that these properties were under productive and that therefore the trustees were under a duty to sell the assets.

The trustees argue that this trust falls into the exception

[7]Both sides try to skew the rate of return in their favor. The plaintiffs base their proposed rate of return on a trust corpus value of $1.3 million which is inaccurate because the trust was worth that in 1986 but certainly not throughout the trust period. The defendants try to include monies spent for upkeep on the property. This money was never received by the income beneficiaries and is an inappropriate consideration in determining whether the rate of return was fair to the income beneficiaries.

[8]We agree that trustees should not be held liable for a decline in property values in the absence of a lack of prudence, but here there was evidence that the trustees had some forewarning of a decline and acted in other ways inappropriately.

stated in *Springfield Safe Deposit & Trust Co., supra,* where the settlor manifests an intent that the trust retain the original trust property even if it is unproductive. "A general authorization to the trustee to retain trust property included in the trust at the time of its creation does not necessarily empower him to retain unproductive property." 3A Scott, *supra* at § 240.1. See Restatement (Second) of Trusts § 240 comment g. The trust instrument must be "interpreted in light of all the circumstances. Among the circumstances tending to show such an intention are: (1) the specific mention in the instrument of the property, particularly where it was known to the settlor to be unproductive property and especially where it comprises the whole of the trust estate. . . ." *Id.* In this case, the properties were not mentioned in the trust, and there is no indication in the record that the settlor knew the property was unproductive at the time of the creation of the trust. While the trust authorized the retention of property, it also authorized the sale of trust assets, and, in fact, the trustees had previously sold two properties. The trust instrument, on its face, manifests no clear preference for selling or retaining the properties. Contrast *Mazzola* v. *Myers,* 363 Mass. 625, 630 (1973) (the will stated, "[i]t is my desire that my Executors and trustees shall continue all of the businesses carried on by me at my death, and that these businesses shall remain in the Kelly family"); *Kingsley* v. *Spofford,* 298 Mass. 469, 477 (1937) ("primary purpose, as disclosed by the will, was to preserve 'for the Spofford family' the greater part of the real estate devised in trust"). The only remaining evidence that the settlor intended that the property be kept even if it became unproductive is the testimony of the trustees, especially Ballard, that they were motivated to retain the property to effectuate the wishes of the settlor that the property remain in the family. The judge did not find the testimony credible, and, as we recount below, there were substantial reasons not to believe this testimony.

The trustees argue that the judge erred in concluding that Ballard acted in bad faith by refusing to sell the properties due to an improper motivation other than the reason Ballard gave — keeping the properties in the family to accord with what she claimed were the wishes of the settlor. Both trustees testified that Ballard wanted to own the properties rather than sell them to someone outside the family. Ballard claims

that this was simply to assure that the properties remained in the family. The trustees, however, had already sold two properties to outsiders, and Ballard never offered the properties to any other family member to keep them in the family. Indeed, Ballard testified that she feared she "would have been left out in the cold with nothing" if she sold, and that she did not consider the effects of her refusal to sell on either the income beneficiaries or the remaindermen. The judge's finding of improper motivation and the judge's assessment of Ballard's credibility is not clearly erroneous in light of this evidence. Ballard's self-interest violates the requirement that a "trustee must exercise good faith and act solely in the interests of beneficiaries in administering the trust. [She] must lay aside self-interest . . . for the office of trustee cannot be subverted to fostering the personal advantage or individual gain of the incumbent. There can be no divided loyalty." *Boston Safe Deposit & Trust Co.* v. *Lewis*, 317 Mass. 137, 140 (1944).

Baylis asserts that, even if Ballard violated her fiduciary duty, he acted in favor of the sale and petitioned the Probate Court for instructions as to how to proceed with the sale. He argues that he therefore cannot be held liable. "It is well settled, that a trustee is not responsible for the acts or misconduct of a co-trustee in which he has not joined, or to which he does not consent, or has not aided or made possible by his own neglect." *Ashley* v. *Winkley*, 209 Mass. 509, 528 (1911). This argument is unavailing. To fulfil his duty, a co-trustee must "participate in the administration of the trust and [] use reasonable care to prevent a co-trustee from committing a breach of trust or [] compel a co-trustee to redress a breach of trust." Restatement (Second) of Trusts § 184 (1959). If one trustee refuses to exercise a power that the trustees are under a duty to exercise, "the other trustees are not justified in merely acquiescing in the non-existence of the power. In such a case it is their duty to apply to the court for instructions." *Id.* at § 184 comment c. See 3A Scott, *supra* at § 184. The judge found that Baylis violated these principles in several ways. First, he largely abandoned his duties of administering the trust to Ballard. This finding is supported by Baylis's own testimony and his considering resigning as trustee. Second, Baylis, aware of Ballard's desire to have the properties for herself and her refusal to sell motivated by her self-interest, "never advised her . . . that her failure to sell

lacked any basis, was not in the best interests of the beneficiaries, and constituted a breach of her fiduciary duties. [He] never advised [her] that, as a fiduciary, she was required to act in the best interests of the beneficiaries. Rather he attempted to urge her to sell by cajoling her and demonstrating to her how he and she would be benefitted, not by how the beneficiaries would be benefitted." These factual findings are uncontested and are not contradicted in the record. Third, while Baylis did file a petition for instructions with the Probate Court as the Restatement requires in such circumstances, he "made no attempt to pursue the petition to sell or to seek a contested hearing on the petition." Baylis contends that his sole obligation was to file the petition and let the beneficiaries fight it out with Ballard, citing G. Newhall, Settlement of Estates § 2.15, at 92 (5th ed. 1994), which states that once the petition is brought before the court, the disinterested fiduciary should remain neutral and has no right to appeal because he has done his "full duty in commencing the action and bringing the parties before the court." Baylis's complaint, however, did not challenge Ballard's refusal at all. Instead the complaint he presented to the court stated that Ballard had submitted her resignation to Baylis and that he had accepted it. The judge, not knowing that Ballard was wrongfully refusing to consent, deferred judgment subject to obtaining Ballard's signature. Baylis never followed up by informing Ballard that she might be in breach of her fiduciary duty by not signing nor did he ask the judge to compel Ballard to agree to the sale. Because Baylis did not file a petition explaining to the judge that the sale would be in the best interests of the beneficiaries and that Ballard was improperly blocking the sale, he did not take the steps reasonably necessary to prevent Ballard from breaching her duty.

As to the judge's finding that Baylis acted in bad faith rather than negligently, the evidence is more questionable. We need not, however, rely on this difficult judgment to affirm the judgment against Baylis because, as we discuss below, the exculpatory clause is ineffective to shield Baylis for ordinary breach of fiduciary duties.

## III

The trustees argue that the trial judge and the Appeals Court erred in concluding that the exculpatory clause was in-

valid because it was improperly inserted into the contract and it limited liability to wilful misconduct or bad faith. The Restatement (Second) of Trusts § 222 (1959) states that "[t]o the extent to which a provision relieving the trustee of liability for breaches of trust is inserted in the trust instrument as the result of an abuse by the trustee of a fiduciary or confidential relationship to the settlor, such provision is ineffective." The Restatement enumerates the following six factors for determining whether such an abuse occurred: (1) whether prior to the creation of the trust, the trustee was in a fiduciary relationship to the settlor; (2) whether the trust was drawn by the trustee; (3) whether the settlor had independent advice as to the trust provisions; (4) whether the settlor is a person of experience and judgment or a person unfamiliar with business affairs; (5) whether the insertion was a product of undue influence or improper conduct by the trustee; (6) the extent and reasonableness of the provision. *Id.* at § 222 comment d, at 518. In this case Baylis was retained as the settlor's attorney to write the trust instrument, the settlor received no independent advice, and the settlor was seventy years old, had had a stroke and was "in questionable health." On these facts, the failure of Baylis to bring the clause to the settlor's attention and explain the implications of the clause was improper and rendered the clause ineffective to protect him. See 3A Scott, *supra* at § 222.4 ("where [the trustee] was the settlor's attorney, and where he inserted the provision without calling the settlor's attention to it and knowing that the settlor did not realize the effect of it, it is ineffective to protect the trustee"); G.G. Bogert, Trusts and Trustees § 542 (2d ed. 1993) ("if there was not entire fair play on the part of the trustee in securing the insertion of the immunity clause it may be refused enforcement, as where the attention of the settlor is not called to the existence of the clause or to its effect and it was included in the document on the initiative of the trustee"); Loring, Trustee's Handbook § 7.2.6 (7th ed. 1994) ("When the attorney-trustee drafts into the instrument a provision limiting liability, there is at best an appearance of impropriety and conflict of interest." "The next best practice is . . . to fully disclose. . . ." The practice of "casually dismiss[ing] as mere boilerplate an exculpatory provision . . . is unacceptable"). Because the clause is ineffective to protect him, the plaintiffs need only show breach of duty to recover from Baylis.

## IV

The trustees appeal the award of damages on the ground that an unforeseeable drop in real estate values caused the decline in the property value and that it was not attributable to their wrongful acts, citing *Springfield Safe Deposit & Trust Co.* v. *First Unitarian Soc'y,* 293 Mass. 480, 488-490 (1936). That case and the others the trustees cite stand only for the proposition that a trustee is not liable for damages for an unforeseen drop in value of the trust assets if, before the drop in value, his decision not to sell the assets was reasonable, *id.,* and was made "without any neglect or breach of good faith." *Harvard College* v. *Amory,* 26 Pick. 446, 465 (1830). We have already determined that the retention of the investment was not objectively reasonable under the circumstances and that the decision to retain was made in bad faith. Where such a breach of trust has occurred, the Restatement (Second) of Trusts § 209 (1959) states: "If the trustee fails to sell trust property which it is his duty to sell, the beneficiary can charge him with the amount which he would have received if he had properly sold the property, with interest thereon." See also *Fine* v. *Cohen,* 35 Mass. App. Ct. 610, 616 (1993) (beneficiary "entitled to be put in the position he would have been in if no breach of fiduciary duty had been committed"). The Restatement does not limit recovery to foreseeable losses, the trustees point to no authority for limiting damages in this way, and we decline to impose such a limitation.

The trustees argue that the judge's finding that the trustees could have sold the property for $1.64 million is clearly erroneous because it is based on the offer made for the property which the trustees eventually rejected. Their argument is based on a contingency in the offer of $1.425 million for the four properties that the buyer obtain financing. Because the buyer never obtained a written commitment for the necessary financing, they argue that the buyer was not ready, willing, and able, and therefore, damages should not be based on so high a figure when the property to be sold to that buyer had been appraised for less than $1.1 million. The trustees point out that the buyer asked five times for permission to extend the deadline because of its inability to obtain financing on the originally agreed upon date. There was, however, substantial evidence suggesting that the buyer was able to obtain the financing. A trustee of the buyer testified that he had an oral

commitment from a bank with which the buyer often did business. Baylis also testified that the buyer had financing and only Ballard's resistance prevented the deal from going through.[9] The judge was entitled to rely on this evidence and his finding that the buyer was ready, willing, and able is not clearly erroneous.

The judge's assessment of damages against the trustees for paying the costs of the settlement with the prospective buyers of the trust property was not erroneous. The trustee is "not entitled to indemnity out of the trust estate for expenses not properly incurred by him in the administration of the trust." Restatement (Second) of Trusts § 244. In this case, Baylis agreed to sell the properties without obtaining Ballard's signature. Such conduct was improper and does not support reimbursement.

V

The Probate Court rejected the trustees' request for fees for having managed the property from 1971 to 1988. The trustees ask for ten percent of the rental income generated for those years which they argue is the customary rate of compensation for managing real estate. After 1988, the trustees turned over the day-to-day management of the properties to a professional management firm which charged that rate. General Laws c. 206, § 16, authorizes the Probate Court to award compensation to trustees even where the trust instrument does not make a provision for them. *McMahon* v. *Krapf*, 323 Mass. 118, 123 (1948) ("entitled to such fair and reasonable compensation for his services as the Probate Court might allow"). Where the trustee, however, agrees to a fixed payment with the settlor of the trust, he is bound by that agreement and is not entitled to a judicial determination of what is fair and reasonable. 3A Scott, *supra* at § 242.6. Restatement (Second) of Trusts § 242 comment h (1959) (agreement on fees need not be memorialized in the trust agreement). Ballard agreed before the death of the settlor to manage the properties for $50 per week. She received that sum and is entitled to no more.

A trustee is only entitled to payment for services actually

---

[9]The lack of a written commitment is not as pivotal as the trustees claim. The purchase and sale agreement was contingent only on a commitment of financing, not a written commitment.

performed on behalf of the trust. *Parker* v. *Hill,* 185 Mass. 14, 17 (1904) ("nothing is to be given as a commission except for services actually rendered, and as a measure of reasonable compensation for the service"). The judge found that Baylis, "in effect, abdicated the entire Trust operations to Mrs. Ballard." Baylis admitted that he had no idea whether he had "worked 5 or 500 hours" on matters for the trust. He had performed a few discrete legal services for the trust and was paid separately for those tasks. On these facts, the judge correctly ruled that there was no basis for compensating Baylis for "services actually performed." *Id.*

Furthermore, "if the trustee pays income to the beneficiaries who are entitled to income and does not deduct the compensation to which he is entitled, evidencing an intention to make no claim to such compensation, he cannot thereafter require the beneficiaries to pay him such compensation, nor is he entitled to such compensation out of income subsequently accruing." 3A Scott, *supra* at § 242.8. By making payments to the income beneficiaries for fourteen years without evidencing any intent to receive compensation other than Ballard's $50 per week, the trustees waived any right to compensation for those years.[10]

For the foregoing reasons, we affirm the judgment of the Probate and Family Court.[11]

*Judgment affirmed.*

---

[10]At the 1985 meeting, the trustees discussed compensation with the income beneficiaries. Thus, from that time until the trustees turned over the properties to professional managers in 1988, the trustees may not have waived compensation, but are still not entitled to compensation for the reasons discussed above.

[11]The remaindermen, who intervened in this suit against the trustees, have asked for an award of attorney's fees under G. L. c. 215, § 45. We decline to award such fees for this appeal.