NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-296

CHRISTOPHER J. DIGIOVANNI

vs.

STEPHEN M. DIGIOVANNI[1] & another.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After years without an accounting or any distributions to him, Christopher DiGiovanni, one of the beneficiaries of the DiGiovanni Family Irrevocable Trust (DFIT or trust), commenced this action, claiming that the defendant trustees had breached their fiduciary duties to him and seeking their removal and other relief due to mismanagement, waste of trust property, commingling of trust funds, and self-dealing. Following an eight-day trial, a judge of the Superior Court issued an amended decision concluding that some of the trustees' actions or omissions had breached their fiduciary duties to the

_____

[1] Individually and as trustee of the DiGiovanni Family Irrevocable Trust.

[2] Maureen Clark, as trustee of the DiGiovanni Family Irrevocable Trust, and Richard B. Aronson.

beneficiaries and that their breaches were willful or reckless. The judge removed trustee Stephen DiGiovanni and ordered him and trustee Richard Aronson to compensate the trust for its losses and pay certain of the plaintiff's attorney's fees and costs.[3] Those trustees now appeal; we affirm.

Background. We draw the facts from the stipulated facts and the judge's findings.

1. The DFIT. The DFIT was created in 2004 by the settlor, Mary DiGiovanni, the mother of the plaintiff, Christopher DiGiovanni, and defendant Stephen DiGiovanni.[4] Christopher and Stephen were both beneficiaries and original trustees of the DFIT; Mary was never a beneficiary or a trustee of the DFIT.[5]

The trust instrument provided that only "disinterested trustee(s)" had authority to make discretionary distributions of

---

[3] Judgment entered against Stephen DiGiovanni in the amount of $2,212,091 and against Richard Aronson in the amount of $889,612, "which represents a joint and several liability with Stephen DiGiovanni." The judgment also ordered Stephen DiGiovanni to pay Christopher DiGiovanni attorney's fees in the amount of $728,849.50, plus costs of $11,923.78, and held Richard Aronson jointly and severally liable for $110,000 of those amounts.

[4] We use the first names of the DiGiovanni family members because of the common surname.

[5] Some of Mary's other children were beneficiaries from 2004 through 2008, but they are no longer beneficiaries and are not parties to this appeal.

2

income or principal to the beneficiaries.[6]  From December 21,

2007, until he resigned on July 29, 2016, defendant Aronson

served as the disinterested trustee of the DFIT.  Aronson was an

attorney whose practice concentrated in estate planning and

estate and trust administration and he had been a trustee for

approximately 200 trusts over his career.  The judge found that

Aronson was an experienced attorney, having drafted thousands of

trusts in his career and having acted as the trustee of numerous

trusts holding real property, including rental property.  From

December 2007 through July 2016, Stephen and Aronson were the

only trustees.[7]

The trust grants broad powers to the trustees over the

trust's property.  Importantly, the trust contains an

"exculpatory clause":

> "No Trustee or successor or additional Trustee hereunder
> shall be personally liable for any loss to the trust
> estate, any act or omission, or any error or mistake of
> judgment or law, unless it results from his or her willful
> or intentional misconduct or bad faith."

---

[6] From 2004 through December 12, 2007, Morris Boladian, a family friend, served as the disinterested trustee.  He is not a party to this action.  Maureen Clark became the disinterested trustee on December 30, 2016.  The judge ruled that her appointment was valid and denied Christopher's request to remove her.  She did not appeal.

[7] Christopher was removed as a trustee in 2007 due to his deteriorating mental health.  He was not replaced with a successor trustee.  He has always remained, however, a beneficiary of the trust.

2. _The Truro property_. The settlor, Mary, had acquired property in Truro from Louis DiGiovanni as part of their divorce settlement and subsequent modification. She obtained subdivision approval for a five-lot subdivision of that property on February 23, 2000. One of the subdivision lots, known as 6 Mary's Way, became the family's vacation home and was never owned by the DFIT. The other four lots, known as 1-4 Mary's Way, were undeveloped, but Mary's plan was to construct a home on each lot, with access to the beach, and use them as rental properties until they were sold. In 2004, Mary directed that the beneficial interest in lots 1 and 3 be transferred to the DFIT. The beneficial interests in 2 and 4 Mary's Way were transferred to the DFIT on December 12, 2008. At that time, 4 Mary's Way had a five thousand square-foot house on it; 2 Mary's Way was undeveloped. Each of the four lots was subject to mortgages when they were transferred into the trust.

The DFIT was unfunded other than the real estate holdings, and development of the properties required loans because the DFIT had no funds to pay real estate taxes or other expenses. With a variety of different forms of financing, including loans from Mary and from Stephen's wife, Donna, development of the lots progressed as follows. Between 2005 and 2007, five thousand square-foot homes were constructed on 1, 3, and 4

4

Mary's Way.[8]  As each home was completed, they were operated as vacation rentals until their sale.  Construction of a ten thousand square-foot home on 2 Mary's Way concluded in July 2015.

From 2004 through 2008, expenses for 1, 3, 4, and 6 Mary's Way were paid from one account at Wainwright Bank even though a different trust held 6 Mary's Way.  From 2008 through 2015, rental income from the four trust properties and the rental income for 6 Mary's Way was deposited and expenses were paid from one account at Bank of Canton.  And, from 2015 through 2019, income from all of the properties, including 6 Mary's Way, was deposited and expenses were paid from a single Rockland Trust account.[9]

The judge found that "Christopher was aware of the construction projects as they were underway" and "never

-----

[8] In 2006, although the properties were operating at a deficit, Stephen installed an outdoor recreation area during the construction of 4 Mary's Way, including a tennis court, basketball court, bocce court, shuffleboard, putting green, horseshoe pit, and swing set, at a cost of $400,000.  While the judge characterized this expenditure as "unwise," he concluded that Stephen had not acted in bad faith or engaged in willful or intentional misconduct in expending DFIT funds to construct the recreation area.

[9] The judge found that this commingling was not, as Stephen testified, required by Bank of Canton; rather, the judge found that it was "consistent with Stephen's lax financial approach to trust matters and failure to distinguish between his own desires and the interests [of], and fiduciary obligations to, the DFIT."

5

complained to the other trustees or to Mary that the construction projects were ill-advised." The judge further found that "Stephen did not act in bad faith in connection with the planning, design, financing, and construction of 1, 3 and 4 Mary's Way and acted without willful or intentional misconduct or reckless indifference to the purpose of the trust or to the interests of the beneficiaries." However, the judge enumerated many imprudent expenditures by Stephen that the judge held did not rise to the level of intentional or reckless conduct but were "strong evidence of Stephen's state of mind, which included a continual extravagance, imprudence and lack of concern for his fiduciary duties." The judge explained that Stephen's "underlying state of mind was never far from willful and reckless disregard of those duties. This pattern [played] a significant role in the court's determination that, on some occasions, Stephen went even farther and did engage in intentional or reckless conduct or bad faith."

3. BSC-Truro Ventures, LLC. At the end of 2007, various high-interest loans were coming due, but the trust did not have the money to pay them. Stephen and Aronson engaged Richard Scimone, a long-time friend, to assist them in obtaining new financing. They worked with Bank of Canton.[10] They created BSC-

_____

[10] Stephen paid Scimone $4,500 per month for three years either as a "broker's fee" or for providing a guaranty of the

6

Truro Ventures, LLC ("BSC" or "the LLC"), a limited liability company, and made Scimone the sole "manager."[11]  Section 3.03 of the LLC agreement provided:

> "Powers and Duties of the Managers.  The business and affairs of the LLC shall be conducted by or under the direction of the [m]anagers, who shall have and may exercise on behalf of the LLC all of its rights, powers, duties and responsibilities."

The powers of the manager also included the power to sell, convey, mortgage, pledge, or encumber any of BSC's real property.  The DFIT held a ninety-nine percent membership interest in BSC and Scimone held a one percent membership interest.  Stephen transferred 1 and 3 Mary's Way to BSC.

In the end, BSC and Stephen, as trustee of another trust, obtained a $3.2 million loan from Bank of Canton, secured by a mortgage on all four Truro lots and the personal guarantee of Scimone, among other security.  The loan was used to discharge several preexisting mortgages on the properties and generated $1.1 million in cash.  In addition, the influx of cash allowed the trust to pay legal fees and other debts in related family

---

loan described infra.  In addition, the trust paid over $200,000 to Scimone for purported legal or consulting services.

[11] Managers were not required to be members, but if a member was a manager, the member-manager was required to have an aggregate interest of at least one percent in income, gain, loss, deduction or credit of the LLC, and maintain an aggregate capital account balance of not less than one percent of the total positive capital account balances of all members, or $500,000, whichever was less.

litigation, leading to the transfer of the beneficial interest in 2 and 4 Mary's Way to the DFIT.

While the benefits of the Bank of Canton loan were many and the judge found that the trustees had "few, if any, other options," the judge also found that "giving control over trust assets to a non-trustee" -- Scimone -- created "serious and obvious risks" that Stephen and Aronson intentionally or recklessly disregarded.  Indeed, Scimone, as sole manager, subsequently used his power to finance three real estate purchases that were unrelated to the business of BSC, using his status as manager or using the BSC properties as security.  In addition, Scimone borrowed money from the trust.  As a result of these transactions, the trust was damaged.  The judge concluded that although Stephen believed in good faith that the Bank of Canton loan was in the best interest of the DFIT, "[t]he same is not true of the gratuitous benefits given to Scimone or the relinquishment of Stephen's responsibilities to manage the [t]rust's assets in the interest of the DFIT's beneficiaries."

Eventually, in 2011, Scimone transferred his one percent membership interest in BSC to Stephen's wife, Donna.  It is unclear whether Scimone technically was removed as a manager of BSC, but other than signing tax returns for BSC in 2022, the record does not reflect that he played a role in BSC or

8

exercised control over the BSC properties after the 2011 transfer.

The properties at 1-4 Mary's Way have been sold; the net proceeds are being held in escrow.

Discussion. The rule is general and fundamental,

"that no person holding trust funds can be allowed to derive any personal gain or advantage, either directly or indirectly, from the use thereof, but he must manage them with a single eye to the advantage of the trust estate; and, if he assumes to use them in any manner for his own benefit or in his own business, he must account for all the profits arising from such use, if profits are made, or for the principal and interest, in case of loss." (Citation omitted.)

Ball v. Hopkins, 268 Mass. 260, 269 (1929). "The rule that a fiduciary may not derive personal advantage at the expense of the trust, nor put himself in a position antagonistic to the beneficiaries of the trust, will be strictly enforced." Johnson v. Witkowski, 30 Mass. App. Ct. 697, 706 (1991). "The burden of proving good faith and fairness is on the trustee, as is the burden to show that any questioned transaction was advantageous to the beneficiaries." Id.

With these general standards in mind, we review Stephen's and Aronson's arguments, understanding that "the judge's assessment of the quality of the testimony is entitled to our considerable respect because 'it is the trial judge who, by virtue of his firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the

9

evidence.'" Edinburg v. Edinburg, 22 Mass. App. Ct. 199, 203 (1986), quoting New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 675 (1977).

1. Abdication of control over trust properties. Although the judge found that the decision to take out the loan from Bank of Canton benefitted the trust and did not constitute a breach of the trustees' fiduciary duties, the judge found that Stephen and Aronson abdicated control over trust properties when they signed the LLC agreement, transferred the properties to BSC, and designated Scimone, who owed no fiduciary duties to the beneficiaries of the trust, as the sole manager of BSC. The judge further concluded that this abdication resulted in $889,000 in damages to the trust. On appeal, Stephen and Aronson do not quibble about the amount of the damages; they argue that they are not liable, because Bank of Canton required, as a condition of the loan, that Scimone hold a one percent interest in BSC and be the sole manager of it. They contend that there was no basis for the judge to conclude otherwise and that the judge's finding that the bank did not require Scimone's interest in BSC or sole control of the management of BSC is clearly erroneous.

We are not persuaded; the evidence does not support the trustees' assertions. The bank's commitment letter spelled out the conditions of the loan in detail; although the conditions

10

were many, other than requiring Scimone to guarantee the loan, the commitment letter did not mention him. Even if we were to agree that the very formation of BSC was "required" by the bank, the bank's failure to take any action that would ensure that Scimone remain the manager is telling. The bank reserved in the commitment letter the right to review and approve the management agreement. Thus, the bank was aware that although the LLC agreement identified Scimone as the "initial Manager[] of [BSC]," it also provided that a manager "may be removed at any time with or without cause by the other Managers or the Members." The LLC agreement further provided that "[a]ny vacancy in the office of Manager shall be filled by the Members." In other words, even though Scimone was designated as the manager, he could be removed at any time, without notice to the bank, which undermines the suggestion that the bank required the trustees to abdicate their duties in favor of Scimone. Further, as the judge noted, when Scimone ultimately transferred his one percent interest to Stephen's wife, permission of the bank was not requested or given, and there has been no showing that the bank sought information about Scimone's interest. We discern no error in the judge's conclusion that the bank did not

11

require that Scimone own one percent of BSC or be its sole manager.[12]

2. Exculpatory clause. The trustees argue that pursuant to the exculpatory clause in the trust instrument, they are liable only for "willful or intentional misconduct or bad faith."  "[T]he case law has long defined the phrase 'wilful default' to include acts committed 'with reckless indifference to the interest of the beneficiary.'"  Passero v. Fitzsimmons, 92 Mass. App. Ct. 76, 81 (2017), quoting New England Trust Co. v. Paine, 317 Mass. 542, 548, 550 (1945).  The trustees contend that they did not knowingly or intentionally disregard an unreasonable risk or take risks that "entail[ed] a high degree of probability that substantial harm would result" (quotation and citation omitted).  Manning v. Nobile, 411 Mass. 382, 387-388 (1991).

This is true, Stephen contends, because he relied on Aronson, who is a lawyer, to review the "structure of the deal" "from a legal perspective," and, citing Dill v. Boston Safe Deposit & Trust Co., 343 Mass. 97, 99-102 (1961), contends that

_____

[12] Stephen testified that he did not see any reason to become a manager because he would still be running the day-to-day operations.  This is despite the LLC agreement, which provided that "[u]nless specifically authorized by the Managers, no Member that is not a Manager shall be an agent of the LLC or have any right, power or authority to act for or to bind the LLC or to undertake or assume any obligation or responsibility of the LLC or of any other Member."

12

such reliance "immunizes him from liability." Again, we are not persuaded. The judge made no finding that he credited Stephen's testimony that he relied on Aronson to review the transaction "[t]o protect the trust from a legal perspective." Rather, the judge credited evidence that "the delegation to Scimone was intentional misconduct, reflected reckless indifference to the interests of the [DFIT] and resulted from, at least, willful blindness to the limiting language" of the trustee's powers contained in the trust instrument.

Aronson, on the other hand, argues that he had "delegated operational control to Stephen," and reasonably relied on Stephen's assessment of Scimone's trustworthiness and on the fact that Scimone was an attorney subject to rules of professional responsibility. However, "[t]o fulfil his duty, a cotrustee must 'participate in the administration of the trust and [] use reasonable care to prevent a co-trustee from committing a breach of trust or [] compel a co-trustee to redress a breach of trust.'" Rutanen v. Ballard, 424 Mass. 723, 731 (1997), quoting Restatement (Second) of Trusts § 184 (1959). See Restatement (Third) of Trusts § 81 (2007). Aronson did not merely agree to delegate certain duties to Stephen and Scimone, he "largely abandoned his duties of administering the trust" to Stephen and Scimone, and thereby violated these principles. Rutanen, supra. Aronson asked for accountings over the years,

13

but took no action when Stephen consistently failed to ever provide Aronson with any financial documents or an accounting. Aronson did not hire an accountant, or monitor any of Stephen's or Scimone's activities to ensure that decisions were made in the best interest of the beneficiaries. He "first expressed concern about Scimone" in March 2015, and only later recommended that he be removed as manager of BSC. Aronson did not seek instruction from the court. See id. He approved the LLC agreement with knowledge that the trust properties were being conveyed to an entity that did not owe fiduciary duties as a trustee to the DFIT. As the judge found, his acts of omission included "the failure to do anything to limit Scimone's legal authority, supervise him, monitor his activity, require documentation or proof, or otherwise attempt to secure fidelity to the trust's interest."[13] Further, the judge found that "there were . . . serious and obvious risks in giving control over trust assets to a non-trustee, as Stephen and Aronson either understood, or recklessly or with willful blindness disregarded.

---

[13] Aronson asserts that he took only one "intentional act[ion]" -- signing the LLC agreement -- suggesting one act is insufficient to overcome the protections of the exculpatory clause. He ignores, however, that his acts of omission may also constitute intentional disregard of an unreasonable risk, and on these facts, his utter abdication of his duties can only be viewed as such intentional disregard, given his vast knowledge of trusts and trustees' duties. The judge did not err in concluding that Aronson's utter failure to exercise his duties as a trustee amounted to intentional misconduct in that sense.

14

Some of those risks later materialized . . . [and] the resulting damage to the DFIT was precisely the type of harm that fell within the scope of the risks that Stephen and Aronson created by signing the LLC agreement, transferring the trust assets to [BSC] and appointing Scimone as sole manager."

It is true that "[a] trustee may avail himself of the services of others for the performance of administrative details," but a trustee cannot "delegate his authority as trustee to [another] nor commit the entire administration of the trust to him."  Milbank v. J. C. Littlefield, Inc., 310 Mass. 55, 62 (1941).  In the absence of any safeguards, Aronson cannot avoid liability for his acts and omissions by claiming he relied on Stephen or trusted Scimone.

Stephen, too, argues that he merely delegated authority to Scimone, and Scimone's misbehavior was unforeseeable.  But, for the same reasons, the argument is unavailing.  The sheer amount of power given to Scimone should have put Stephen on notice of the potential dangers.  More importantly, Stephen not only turned a blind eye to those dangers, but the judge found that he was aware of Scimone's misdeeds even before they happened and, in some instances, approved of them.  As the judge noted, the trustees' conduct went much further than delegating ministerial tasks.

15

3.  Damages.  Next, citing to page seventy-eight of the judge's decision, Stephen argues that the damages award must be reversed because it is premised on the judge's "speculation" that "all [Stephen] had to do to get the loan was 'obtain another form of security or someone else's personal guarantee to convince the Bank to lend the money.'"  Stephen takes the judge's statement out of context.  The judge made that statement in concluding that it was not "willful misconduct to seek the Bank of Canton loan, even though the DFIT's debt service increased substantially."  The judge explained that at the time,

> "Stephen had few, if any, other options.  He also had to obtain another form of security or someone else's personal guarantee, to convince the Bank to lend the money.  Given the DFIT's challenging financial circumstances and the economy, Stephen acted for the purpose of preserving the DFIT's existence and to pursue the development of the Trust Properties."

Indeed, the judge continued, "[t]he DFIT's difficult circumstances resulted, of course, from many risky and extravagant decisions that Stephen made earlier, but none of that went beyond the protection of the exculpatory clause."  The judge awarded no damages on the decision to borrow $3.2 million from Bank of Canton.  As discussed, the damages award derived from the trustees' decisions to abdicate to Scimone their responsibilities to the beneficiaries of the trust -- not from their decision to obtain the Bank of Canton loan.

16

4. Mary's loans. The judge ordered Stephen to reimburse the trust $92,983 in excess payments from DFIT funds that benefitted Mary because Mary was not a beneficiary of the trust. The judge found that Mary made loans to the DFIT totaling $1,471,783.99, as Christopher asserted; on appeal, Stephen asserts that Mary made loans totaling $2,571,783.99. Stephen contends that the judge's choice between the amounts Christopher contended were paid on Mary's behalf and the amounts that Stephen now contends were paid was clearly erroneous. We disagree. "If the trial judge makes one of several possible choices of what facts are supported by the evidence, the judge's choice is not clearly erroneous." Rood v. Newberg, 48 Mass. App. Ct. 185, 191 (1999), quoting W. Oliver Tripp Co. v. American Hoechst Corp., 34 Mass. App. Ct. 744, 751 (1993).

Here, Stephen's testimony was inconsistent, and we discern no error in the judge's finding that on redirect examination, Stephen testified that the trust owed Mary $1.4 million. Moreover, the difference between the amounts seems to equal the amount of proceeds from a Countrywide mortgage loan that Mary obtained on December 8, 2005. While Stephen contends that the trust's account received $1,293,597.06 on December 8 as a result of that loan, he also concedes that $1.1 million was wired to Mary's investment account from the trust's account. The judge drew the reasonable conclusion that the trust was entitled to a

17

$1.1 million credit to Mary's loans from that transfer. Stephen offers no alternative explanation as to how the $1.1 million transfer should be considered. Accordingly, the judge's finding was not clearly erroneous.

5. Donna's loans and interest. The judge credited testimony that Stephen's wife, Donna, and her company made substantial loans to the DFIT that benefitted the DFIT and were obtained in good faith. The judge also found that Donna was paid a total of $474,447 in interest. The judge found that although the loans violated Stephen's duty of loyalty due to the presumptive conflict of interest between Stephen's personal interests and his duties as trustee, because the loans were necessary and beneficial to the DFIT, and because court approval, had it been requested, likely would have been granted, the judge initially declined to disallow the $474,447 in interest. On a motion for reconsideration, however, Christopher argued that some of the interest paid to Donna should have been allocated to 6 Mary's Way. The judge agreed and ordered Stephen to account for use of proceeds from Donna's loans to benefit 6 Mary's Way. When Stephen responded that he was "unable to determine a logical way to attribute loans made by Donna to 6 Mary's Way," the judge concluded that "[t]his inability is entirely of Stephen's own making, as it results from his commingling of accounts and failure to keep contemporaneous

18

records[;] . . . it constitutes self-dealing and intentional misapplication of DFIT assets, for which Stephen is liable." The judge disallowed the entire $474,447 of interest.

Stephen's sole argument on appeal is that the judge's conclusion is clearly erroneous because there are no facts on which to base the conclusion that the loans from Donna were not used solely for DFIT purposes. "It was for the defendants to keep the trust fund distinguished from other moneys in their hands; and the consequences of any failure on their part to comply with this duty must fall upon themselves." Attorney Gen. v. Bedard, 218 Mass. 378, 386 (1914). Further, Stephen ignores that the judge allowed him the opportunity to provide those facts, but he could not do so -- because he had commingled the accounts. "Where a trust is established the burden is upon a trustee to show that he acted with reasonable skill and judgment and to account for all the trust property which came into his possession. If unable to account he must stand the loss." Markus v. Markus, 331 Mass. 394, 399 (1954). We discern no error.

6. Stephen's fees. Stephen challenges the judge's reduction of fees he charged to the trust for property management, professional services, and construction fees. While concentrating on specific findings that he contends were clearly erroneous, Stephen ignores the portion of the judge's analysis

19

that all of Stephen's fees, unapproved by the disinterested trustee, constituted self-dealing; that with no credible evidence of specific hours and tasks performed, and without timely accountings that would have resolved many unanswered questions, the judge's findings were necessarily made on "meager evidence" about long-past matters; and that the judge found Stephen's testimony on these matters was not credible. Thus, the judge reasonably cautioned that especially in the absence of detailed, contemporaneous and reliable records, as well as consensus about a reference point to evaluate the fees, mathematical precision of the amount of damages was unlikely.

Stephen charged the trust a professional services fee separate and apart from a property management fee, and the judge reduced the professional services fee by fifty percent. Stephen argues that the judge, without basis in the record, erroneously concluded that a property management fee would have included "professional services," including the costs of lawn care and maintenance of the properties, and erred in reducing the fee Stephen charged. First, the evidence simply was not as clear or compelling as Stephen suggests. He testified that a property management fee is a "fee that the management company charges to maintain and operate" a property. He attempted to distinguish between arranging for maintenance and actually doing some of the necessary tasks -- which he characterized as "professional

services" -- but the judge did not credit that distinction.  We discern no error in the judge's conclusion that Stephen had not presented credible evidence the fees were not duplicative.

Moreover, even aside from determining that the fees were duplicative, the judge reduced the fees because, in the aggregate, the fees exceeded the lower bound of property management fees in the area and because of the unauthorized nature of the fees and the trustees' willful breaches of their duty to account.  The judge noted that a timely accounting would have answered the obvious question:  "if third parties already performed services for fees that already came close to full payment for comprehensive property management, what else was left [for] Stephen [to] do?"  Applying equitable principles and extrapolating from the strictly conservative principles applied to awards of attorney's fees in a nonvoluntary relationship, see Mulhern v. Roach, 398 Mass. 18, 31 n.15 (1986), the judge determined that a fifty percent reduction of fees was warranted.  The judge applied the same analysis to the construction management fees[14] Stephen paid himself or charged to the trust

_____

[14] The trust entered into a joint venture with Edward Medeiros to construct a home on 2 Mary's Way in the fall of 2014.  The joint venture paid Stephen a "general contractor's fee" of ten percent, which, the judge found, was less than that charged by general contractors in the vicinity.  The judge also found, however, that Stephen's role was more akin to "owner's representative," because he did not track his hours or submit time sheets.

21

and also reduced those by fifty percent.  In the circumstances of this case, we discern no abuse of the judge's discretion. See Lattuca v. Robsham, 442 Mass. 205, 210 (2004) (attorney's fee award generally based on interplay of many factors and is always highly discretionary).

7. Miscellaneous.  The miscellaneous factual challenges raised by Stephen demonstrate no clear error.  The judge rejected on credibility grounds Stephen's explanation for how the $200,000 holdback related to the Wainwright payoff was handled.  "Findings that are based on credibility assessments are uniquely the province of the trial judge, and we will not disturb them on appeal."  Corrado v. Hedrick, 65 Mass. App. Ct. 477, 484 (2006).  Similarly, the judge rejected on credibility grounds Stephen's explanation for a $100,000 payment to an attorney which Stephen and Donna suggested was a partial repayment of amounts due to Donna or her companies.  We agree that the documentation regarding the $100,000 payment is unclear and discern no error in the judge's credibility determination.

8. Attorney's fees.  Relying on a statement in Tocci v. Tocci, 490 Mass. 1 (2022), Stephen contends that the trustees should not be charged with Christopher's attorney's fees because Christopher brought his claims only for his own benefit.  Tocci, however, addressed closed corporations and specifically distinguished trusts from closed corporations.  Id. at 19-21.

22

Further, Tocci, supra at 20, quoted with approval Allard v. Pacific Nat'l Bank, 99 Wash. 2d 394, 408 (1983), which states that "[w]here litigation is necessitated by the inexcusable conduct of the trustee, . . . the trustee [of a trust] individually must pay" plaintiffs' attorney's fees. Cf. A. Newman, G.G. Bogert, & G.T. Bogert, Trusts and Trustees § 970 (3d ed. 2010) (trustee is liable for damage to trust estate caused by trustee's breach of trust).

Stephen also argues that because his sisters helped fund the lawsuit in exchange for a share in Christopher's beneficial interest in the DFIT, Christopher did not suffer a loss. Although Christopher may not have to pay back his sisters' expenditures on his attorney's fees, he does have to share his beneficial interest in the DFIT. Thus, Stephen's suggestion that Christopher has suffered no harm is without merit.

For all of the foregoing reasons, we affirm the amended judgment.[15]

So ordered.

By the Court (Sacks, Singh &
Walsh, JJ.[16]),

Assistant Clerk

Entered: May 21, 2024.

---

[15] Stephen's and Aronson's requests for appellate attorney's fees and costs are denied.  Christopher's request for appellate attorney's fees and costs against Stephen and Aronson is allowed.  Christopher is invited to file a verified and itemized application for such fees and costs within fourteen days of the date of this decision, and Stephen and Aronson will have fourteen days thereafter in which to file any opposition to the amounts requested.  See Fabre v. Walton, 441 Mass. 9, 10-11 (2004).  For substantially the reasons set forth in the judge's decision on the parties' motions for attorney's fees, Stephen individually will be liable for the full amount to be awarded, and Aronson individually will be jointly and severally liable for about fifteen percent of that amount.

[16] The panelists are listed in order of seniority.